640 So.2d 775 (1994)
Patrick MENARD, Plaintiff-Appellee,
v.
WINN DIXIE LOUISIANA, INC., Defendant-Appellant.
No. 93-1497.
Court of Appeal of Louisiana, Third Circuit.
June 1, 1994.
*777 Toxie L. Bush Jr., for Patrick Menard.
James Melville Taylor, Donna B. Wood, for Winn Dixie of Louisiana, Inc.
Before DOUCET, LABORDE and BERTRAND,[1] JJ.
LABORDE, Judge.
Defendant appeals the hearing officer's finding claimant entitled to temporary total disability benefits, additional medical benefits, and attorney fees. We affirm the hearing officer's findings as to additional medical benefits and attorney fees, but remand for reconsideration of the employee's disability.

Facts
This case concerns benefits awarded claimant for persistent back and urological problems found to be employment-related.
Claimant first experienced back pains March 1, 1990, after loading five or six one hundred pound containers of cheese onto a truck for his employer. He was seen by Dr. Louis Latour, his family physician, who prescribed bed rest, oral medication, an injection of Celestone, X-rays and a later CT scan. After reviewing results of the X-ray, Dr. Latour recommended that claimant see Dr. Louis Blanda, an orthopaedic surgeon.
Before his appointment with Dr. Blanda, claimant was seen by Dr. Gregory Gidman, an orthopedist, at the request of Ms. Jane Frinz of Crawford Insurance Company. According to Dr. Gidman, claimant was very cooperative and unsuspicious. During examination, claimant complained of pains in the back when asked to perform certain diagnostic exercises, but other tests appeared normal. Dr. Gidman suggested physical therapy, continued medication, and an MRI of his lumbosacral spine. Dr. Gidman further noted that if the MRI yielded a very positive finding at L4-5 for a herniated disc, the patient might need a myelogram with follow-up MRI of the same region to complete the diagnosis; otherwise, Dr. Gidman "would just continue him with nonoperative treatment."
On March 23, 1990, claimant saw Dr. Blanda. Dr. Blanda's findings were consistent with those of Drs. Latour and Gidman, except that he further recommended a urological exam and recommended that claimant see Dr. Beacham for that purpose.
When claimant returned to see Dr. Blanda on March 30, Dr. Blanda reviewed the CT scan, myelogram, and MRI taken of claimant and diagnosed apparent bulging discs at L4-5 and L5-S1, with a probable small herniation at the latter. He suggested that claimant continue with therapy for an additional three weeks; if that did not work, claimant would have to consider options, including a discectomy.
On April 2, 1990, the day Dr. Blanda's March 30 notes were transcribed, Dr. Gidman again saw claimant. It was his opinion, based on the MRI, that claimant did not have a ruptured disc, but was nonetheless unable to work due to his persistent subjective complaints. Dr. Gidman prescribed intensive physical therapy as well as non-steroidal anti-inflammatory medication, and further recommended a myelogram and CT scan if claimant had not improved in the following four to six weeks. Dr. Gidman indicated that he would not make arrangements for a return visit since he was only asked to conduct an Independent Medical Examination.
When claimant returned to see Dr. Blanda May 1, 1990, still complaining of pains, Dr. Blanda noted that the physical therapy prescribed by Dr. Gidman never occurred. Dr. Blanda then recommended three to four weeks of physical therapy, noting that if claimant's symptoms were not alleviated, he would probably have to proceed with a discectomy.
*778 Physical therapist Lorain Gilbert assisted claimant from May 39 until early June. She observed that claimant was a very motivated individual who attended his sessions punctually and gave great effort during his sessions. The therapist noted three principal problems: decreased lumbar motion as evidenced by his difficulty in bending forward, backward, and sideways; decreased flexibility of the hamstrings, extensors, and right flexor; and lumbar scoliosis.
Claimant was again seen by Dr. Gidman on August 20, 1990. Dr. Gidman again noted that claimant was "very cooperative" and showed no signs of exaggerating his complaints. The physician reviewed the x-rays and noted scoliosis. His understanding of the MRI of the lumbar region taken March 27, 1990 was that it showed degenerative discs at L4-5 and L5-S1, with mild bulging at the latter. The March 12, 1990, CT scan reported some herniation at L4-5. The X-rays corroborated these findings; nonetheless, in light of claimant's "totally normal" clinical examination, Dr. Gidman would not recommend any surgery. Instead, Dr. Gidman suggested a myelogram and follow-up CT scan. If they showed positive, he would recommend a discectomy; if they did not show "significant" problems, he would not, as he did not have faith in or use discography in his practice. He placed claimant on a no-work status.

Facts Pendente Lite
Suit was filed September 17, 1990, after defendant refused to pay for an operation Dr. Blanda believed was essential to alleviate claimant's persistent pains.
On December 26, 1990, Dr. Gidman examined claimant. For the third time, he noted that claimant was "very cooperative" and did not "see any suspicion of exaggeration of his complaints."
On January 3, 1991, Dr. Blanda concurred with Dr. Gidman's opinion that a myelogram and post-myelogram CT scan should be conducted in addition to an earlier CT scan to confirm the need for surgery.
On January 8, Dr. Robert Osborne performed cervical and lumbar myelograms. His impressions included L4-5 mild disc bulge; L5-S1 disc bulge or protrusion.
On January 9, after reviewing the myelogram and follow-up CT scan, Dr. Gidman noted bulging at the L4-5 and L5-S1 level. Claimant was complaining of lower back and right leg pains in addition to bladder troubles. Dr. Gidman concluded that the L4-5 bulge was "pathologic," but not the L5-S1. He suggested that claimant be seen by a neurosurgeon, but did not believe he had a herniated disc in the lower back, and if he did, "from an orthopedic standpoint," would recommend conservative treatments, not surgery. Dr. Gidman again noted that claimant could not return to work because of pains in his lower back.
On January 24, 1991, Dr. Blanda formally requested authorization for the discectomy from the employer's insurer in his progress notes, a courtesy copy of which he forwarded to the insurer. Dr. Blanda suggested that claimant return once he had a copy of the myelogram and CT scan. On January 31, 1991, claimant returned to Dr. Blanda with his CT scan and myelogram. His progress note of that date indicated that claimant "is still agreeable with [having a discectomy] and again it will be scheduled pending approval from the insurance company."
Claimant returned to Dr. Blanda on March 19, 1991. His progress notes of the day:
 DATE: 3/19/91
PATIENT: MENARD, Patrick A.

PROGRESS NOTE:
Mr. Menard says he is still in limbo as far as treatment is concerned. He says the insurance company and Dr. Gidman are trying to get him to have his neck operated on. He says he doesn't know why. He says his neck really doesn't bother him except for occasional pain and headaches. It is his low back that is his major concern. His low back and right leg pain continue to be problem. I think this is the most absurd thing I every heard. The patient should not have surgery on his neck if it is not symptomatic. He said he went to see Dr. Flynn in Baton Rouge who examined his neck and his low back and I am curious as to what Dr. Flynn's recommendations might be. I will see Mr. Menard *779 again in about 2 months. I gave him a prescription for plain Soma.
 /s/L. Blanda MD
 Louis C. Blanda, Jr., M.D.
LCB/eb
3/21/91
Dr. Flynn's findings related by a March 7, 1991 medical report were at odds with Dr. Blanda's. The exercises he chose for claimant showed negative. Reporting his interpretations of x-rays of the lumbar spine, a lumbar myelogram, and a contrast CT scan taken two months before, but not a more recent MRI, neurosurgeon Flynn found some degeneration at L4-5, which he believed to be pre-existing. He concluded that any pains could be attributed to an aggravation of this problem caused by repetitive bending or lifting. Dr. Flynn indicated that "one would expect, with conservative treatment, the transient aggravation to have subsided within 6-12 weeks of the date of the incident at work in March of 1990." These findings were essentially reiterated in an April 16, 1991, report after he reviewed certain unspecified "studies," probably X-rays, that had been forwarded by defendant.
On May 21, 1991, Dr. Blanda again saw claimant, having read Dr. Flynn's medical report. Dr. Blanda noted that Dr. Flynn did not find anything wrong with claimant and no need for surgery. Dr. Blanda indicated that without approval from his employer's insurer, no surgery could be undertaken.
On October 1, 1991, knowing claimant had not been approved for any type of treatment, Dr. Blanda nonetheless saw claimant. Claimant, now complaining of more frequent urological symptoms, indicated that he was told by a rehab nurse that he should be seen by a urologist. Dr. Blanda noted that he had long before wanted claimant evaluated by a urologist for urological symptoms of neurogenic origin, but could not get approval from the workers compensation insurer. Dr. Blanda noted that if claimant had neurogenic damage to the bladder, it was probably related to the back, "and if it is of any permanent nature it will be directly related to delayed treatment."
Claimant was seen by urologist Al Beacham November 14 and December 16, 1991. On the first examination, Dr. Beacham was unable to discern any uropathologic abnormalities and sought permission to conduct additional testing. Those exams were conducted by Dr. Beacham December 16, who found "definite evidence of neurogenic ... dysfunction" bringing about claimant's symptoms. Dr. Beacham offered his clinical opinion that the symptoms were caused by, or contributed to, by the "known intervertebral disk disease" for which he thought surgery necessary.
Claimant testified that he was additionally referred by defendant to a urologist, Dr. Tolson, for a second opinion. According to claimant's uncontradicted testimony, Dr. Tolson's findings were consistent with Dr. Beacham's.
On January 27, 1992, Dr. Gidman performed an orthopedic examination which appeared "quite normal" to him. Dr. Gidman could not explain Dr. Beacham's urological findings that had been attributed to claimant's spine. His review of the MRIs and other previous studies on January 28, 1992, confirmed his difference of opinion with Dr. Beacham. Dr. Gidman suggested that an MRI be conducted to ascertain whether claimant's lumbar spine had undergone some change since the MRI of 1990 to account for Dr. Beacham's diagnosis. Defendant offered no other evidence to rebut Dr. Beacham's conclusions.
On June 2, 1992, Dr. Blanda reviewed the cervical and lumbar myelograms and the CT scan. He noted cervical spondylosis at C4-5 and C5-6. The lumbar myelogram appeared normal, but mid-line defects at L4-5 and L5-S1 and unusual spacing was noted. Due to what he viewed as conflicting test results and different recommendations, he recommended that claimant be seen by neurosurgeon Robert Rivet. Referring to a report from Dr. Domingue, Dr. Blanda concurred in the possibility that a CT scan with post discography could be required to delineate whether in fact claimant suffered from a herniated disk.
On June 15, 1992, claimant was seen by Dr. Robert Rivet, a neurosurgeon. Dr. Rivet reviewed the results from the MRI, CT scan *780 and myelogram and noted "some minimal spondylosis" at C4-5 and 5-6, but "was not certain" that an operation to the region "would be of any significant help to him." Dr. Rivet suggested that before such an operation be conducted, claimant have a second opinion by Dr. John Jackson. Dr. Rivet explicitly stated that he would not comment on claimant's lumbar spine.
Dr. Blanda reviewed Dr. Rivet's findings on June 30, 1992. He found "certainly reasonable" Dr. Rivet's recommendations that claimant see Dr. Jackson in New Orleans and that a more aggressive physical therapy ensue with Dr. Franklin, a physician specializing in physical medicine and rehabilitation. Claimant was scheduled for follow-up in four to six weeks.
Apparently, claimant was never seen by Dr. Jackson.
On July 9, 1992, claimant was seen by Dr. Robert Franklin, who performed a medical examination and noted claimant's subjective complaints in the lumbar and cervical areas. His assessment was that claimant had degenerative joint disease of the cervical and lumbar regions, myofascial pain syndrome, and secondary radiating symptoms.
By correspondence dated June 30, 1992, and received in July, claimant complained to the Office of Workers Compensation of defendant's refusal to pay for surgeries he claimed were recommended by orthopedist Blanda and urologist Beacham.
It was not until about September 16, 1992, that the insurer approved Dr. Franklin's treatment plan first enunciated in his July 9 evaluation. His examination of that day revealed no change in claimant's condition. Dr. Franklin prescribed a TENS unit to desensitize claimant's nerves, physical therapy, and pain medication, stating, "He will remain disabled."
By correspondence of October 1, 1992, Office of Workers Compensation Dispute Resolution Officer Steven LeBlanc confirmed that Dr. James Roland Lafleur, an orthopaedic surgeon, would review claimant's medical file "to address the medical necessity of the surgery recommended by Dr. Louis C. Blanda." Dr. Lafleur reviewed claimant's charts and performed a personal evaluation. His conclusions, which he explained to claimant, were that claimant had cervical spondylosis and thoracolumbar scoliosis, but no ruptured disks. His review of claimant's tomograms showed no definite spondylosis, leading him to revise his diagnosis of claimant's lumbar region to lumbar chronic back pains from spondylosis to that region.
On November 11, 1992, claimant was again seen by Dr. Franklin. According to Dr. Franklin's assessment, claimant was happy with the treatment he had been receiving and indicated improvements in the neck and back, although he continued to have, in the doctor's words, "significant lumbar pains." Claimant indicated that the physical therapy was helping, so Dr. Franklin continued him on that course "for now." Dr. Franklin continued to classify claimant as "disabled."
On January 6, 1993, claimant returned to Dr. Rivet. His pains apparently worsening, Dr. Rivet discontinued claimant's physical therapy, prescribed stronger anti-inflammatory medication, and continued him on a home based rehabilitation program. Dr. Rivet further ordered X-rays of the right hip and a bone scan.
Dr. Rivet seemed discouraged when claimant returned to see him March 9, 1993. He noted no changes in claimant's symptoms, and was concerned that he would not be able to help him conservatively. ("He is reaching maximum medical improvement from a conservative standpoint.") Dr. Rivet re-ordered the bone scan and X-rays of the right hip, noting they were not funded. Claimant would "remain disabled."

Trial
The parties joined issue for trial in March 1993. Plaintiff stipulated that he had received disability checks regularly, but complained of defendant's refusal to pay for the surgery long recommended by claimant's treating physician, Dr. Blanda, and the urological procedures recommended by Drs. Beacham and Blanda.
Defendant articulated the issues to include whether claimant in fact sustained a work-related injury. Defendant alleged that claimant could return to work, was no longer *781 entitled to benefits, and needed no further treatments.

Judgment Below
After considering the evidence presented, the hearing officer concluded that claimant was entitled to temporary total disability and to the operation recommended by Dr. Beacham. She further determined that defendant's failure to offer claimant the tests sought by Dr. Franklin and urological relief recommended by Dr. Beacham arbitrary, insofar as defendant neither consented to the procedures nor controverted their necessity. After the tests were completed, claimant was to see Dr. Blanda for follow-up care.

On Appeal
Defendant suggests that the hearing officer erred in finding defendant wrongly refused to permit urologist Beacham to perform an operation when he was not specific as to the type he was proposing. Second, defendant maintains that claimant did not prove his entitlement to temporary total disability by clear and convincing evidence, as required by LSA-R.S. 23:1221(1)(c). Finally, defendant maintains that it should not have been assessed with attorney fees. In his answer, plaintiff seeks additional attorney fees.
Defendant attributes its refusal to allow surgeries by Drs. Blanda and Beacham or diagnostic tests by Dr. Franklin to expert medical testimony. It suggests that its reliance on such advice necessarily precludes imposition of sanctions.

OPINION

Temporary Total Disability
Ordinarily, the question of whether or not a worker is temporarily totally disabled is a question of fact best left to the factfinder, Landry v. Central Industries, Inc., 592 So.2d 478, 480 (La.App. 3d Cir.1991), writ denied, 593 So.2d 381 (La.1992), whose determinations of fact, regardless of the source of the admissible evidence scrutinized, are not to be disturbed on appeal absent manifest error. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706 (and citations therein).
Nonetheless, compensation for temporary total disability benefits shall be awarded only if an employee not engaged in employment proves by clear and convincing evidence that he is physically unable to engage in any employment or self-employment. It is the claimant who has the burden of proof. Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277, 279 (La.1993).
At the outset, we note that the hearing officer apparently applied the wrong burden of proof to the claimant's injury, which occurred March 1, 1990. The Louisiana Workers Compensation Act in effect on the date of plaintiff's injuries is controlling, as we stated in Miller v. J.P. Owen Co., Inc., 509 So.2d 1038, 1040, 1041 (La.App. 3d Cir.), writ denied, 514 So.2d 455 (La.1987). The 1989 amendments to our state's workers compensation laws, effective January 1, 1990, set forth a more stringent burden of proof for those seeking temporary total disability benefits. Prior to their effective date, the burden of proof in a claim for disability benefits was by a preponderance of the evidence. However, under the statute as amended, the claimant must prove the nature and extent of his disability by clear and convincing evidence. LSA-R.S. 23:1221(1)(c). See generally Rosella v. DeDe's Wholesale Florist, 607 So.2d 1055, 1060 (La.App. 3d Cir.1992). Thus, the hearing officer clearly erred and her award of benefits cannot stand on its own.
When, as in the case sub judice, a reversible error of law has been committed, the court of appeal is required to redetermine the facts de novo from the entire record and attempt to render judgment on the merits. Gonzales v. Xerox, 320 So.2d 163 (La. 1975). We have complied with our mandate.
Entitlement to workers compensation benefits usually turns on the claimant's ability or inability to earn wages. LSA-R.S. 23:1221(1)(a). Faced with conflicting testimony, the hearing officer determined that claimant showed by a preponderance of the evidence that he was totally disabled.[2] Favoring *782 this conclusion were the findings of some, but not all, of the experts, but not claimant's testimony.[3]
While we are unable to permit the hearing officer's disability determination to stand on its own owing to the patent legal error set forth above, the outcome is unaffected.
Defendant argues that the hearing officer failed to consider the testimony offered by the independent medical experts it and the hearing officer retained, and accorded too much weight to the testimony and reports of the only urologist whose opinion has been made known. The hearing officer is granted considerable leeway in evaluating expert testimony, except where the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). The testimony the hearing officer chose to rely upon is not patently unsound.
Faced with conflicting expert testimony, we are unable to second-guess the hearing officer and reach the definitive conclusion suggested by defendant.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La. 1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, "Manifest Error" Further observations on appellate review of facts in Louisiana civil cases, 22 La.L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.2 See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La.L.Rev. 761, 764 (1980); Comment, Appellate Review of Facts in Louisiana Civil Cases, 21 La. L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in *783 demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter, supra at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La. 1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La. 1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979). Where documents or objective evidence so contradict witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. See, Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir. 1982), writ denied, 443 So.2d 586 (La.1983). Cf. State v. Mussall, 523 So.2d 1305 (La. 1988); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); U.S. v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. See, Jackson v. Tate, 428 So.2d 882, 884 (La.App. 1st Cir.1983), citing McDonald v. Book, 215 So.2d 394 (La. App. 3d Cir.1968), overruled on other grounds, Celestine v. Hub City Motors, Inc., 327 So.2d 700 (La.App. 3d Cir.1976). Cf. Anderson, supra, at 575, 105 S.Ct. at 1512; Schexnider v. McDermott International Inc., 868 F.2d 717, 720 (5th Cir. 1989); Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 770 (5th Cir.1989); U.S. v. Hibernia National Bank, 841 F.2d 592, 595 (5th Cir.1988); Hanson v. Veterans Administration, 800 F.2d 1381, 1388 (5th Cir.1986).
2 The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La. Const. 1974, Art. V Sec. 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual finding will not be upset unless it is manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). See also, McLean v. Hunter, 495 So.2d 1298 (La. 1986); Otto v. State Farm Mut. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La. 1980).
Rosell v. ESCO, 549 So.2d 840, 844-845 (La. 1989).
Nor need we find dispositive the testimony of Dr. Lafleur. The court-appointed expert's opinion by law must be considered prima facie true, LSA-R.S. 23:1123; however, it is not conclusive. Stated differently, while the law permits the hearing officer to appoint a physician to perform an independent medical examination, it does not require the hearing officer to accept his conclusions. See generally, Green v. Louisiana Coca Cola Bottling Co., 477 So.2d 904 (La.App. 4th Cir.), writ denied, 478 So.2d 910 (La.1985). A hearing officer simply does not cede the responsibility afforded her office when she chooses to appoint an independent medical examiner.
In evaluating the evidence, the trier of fact normally should accept as true the uncontradicted testimony of a witness, even if the witness is a party. West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1147 (La. 1979); Hopes v. Domtar Industries, 93-127 (La.App. 3d Cir. 11/3/93), at 12 (and cite therein), 627 So.2d 676. This is because a finding of disability vel non is a legal rather than a purely medical determination. DeGruy v. Pala, Inc., 525 So.2d 1124, 1133 (La.App. 1st Cir.), writ denied, 530 So.2d 568 (La.1988). However, where there is conflicting testimony, the factfinder is to determine claimant's disability after reviewing the totality of the evidence, including both lay and medical testimony. Eglin v. United Gas Pipeline, 93-1179 (La.App. 3d Cir. 4/6/94), 635 So.2d 599.
*784 Not having the opportunity to witness first hand the testimony concerning claimant's physical condition, we are unable to say one way or the other whether claimant proved clearly and convincingly that he was disabled under LSA-R.S. 23:1221(1)(c), which reads as follows:
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
A remand on the issue is therefore in order. See Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277, 281 (La.1993).
Nonetheless, claimant remains entitled to additional medical benefits under LSA-R.S. 23:1203(A), which provides as follows:
A. In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services. All such care, services, and treatment shall be performed at facilities within the state when available. The obligation of the employer to furnish such care, services, treatment, drugs, and supplies, is limited to the reimbursement determined to be the mean of the usual and customary charges for such care, services, treatment, drugs, and supplies, as determined under the reimbursement schedule annually published pursuant to R.S. 23:1034.2 or the actual charge made for the service, whichever is less.
Amended by Acts 1988, No. 938, § 1, eff. Jan. 1, 1989.
Virtually all of the medical and lay evidence shows that claimant would require continued, regular treatment for his back conditions, and not simply for legal or diagnostic purposes. Therefore he was properly awarded additional medical benefits under LSA-R.S. 23:1203.

Attorney Fees
The determination of whether an employer should be cast with penalties and attorney's fees is essentially a question of fact and the trial court's finding shall not be disturbed absent manifest error. Bradley v. Justiss Oil Co., Inc., 618 So.2d 646, 650 (La.App. 2 Cir.1993); Slate v. Travelers Ins. Co., 556 So.2d 903 (La.App. 3d Cir.1990). In Chelette v. American Guar. & Liability Ins., 480 So.2d 363 (La.App. 3 Cir.1985), this court set forth the standards generally used for awarding penalties and attorney's fees. In awarding statutory penalties, the test to be applied is whether the employer or his insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. Attorney fees, on the other hand, are to be imposed if the insurer is found to be arbitrary, capricious or without probable cause in its failure to pay a claim within 60 days after receipt of written notice of the claim. Id.; LSA R.S. 23:1201.2. A worker's compensation claim is "reasonably controverted," precluding imposition of penalties, if the employer had sufficient factual and medical information upon which to base a decision to reduce or terminate benefits. Bradley, supra, at 651.
The hearing officer concluded that the operation recommended by Dr. Beacham was warranted, as were certain tests recommended by Dr. Franklin. Since it found no countervailing medical evidence offered in support of defendant's protracted failure to authorize these procedures, the hearing officer awarded $5,000 in attorney fees. We affirm. Although perhaps Drs. Blanda and Beacham could have been more *785 articulate as to claimant's urological complaints, defendant erred in completely disregarding their medical reports. Faced with these reports, defendant was obligated to either authorize the urological and other procedures, or obtain an updated urological report indicating further intervention was unnecessary. See, e.g., Johnson v. Ins. Co. of N. America, 454 So.2d 1113, 1119 (La.1984); Charles v. Aetna Cas. and Sur. Co., 525 So.2d 1272, 1275 (La.App. 3d Cir.), writ denied, 531 So.2d 480 (La.1988).
We find no clear error in the hearing officer's award of attorney fees. In response to claimant's Answer to Appeal, we award additional attorney fees of $1,250 for efforts expended on appeal.
It is well-settled that employers and their insurers are not obligated to pay for evaluations requested by the employee's attorney for purposes of litigation. Price v. Fireman's Fund Insurance Co., 502 So.2d 1078 (La.1987); Benoit v. Giant Rentals, Inc., 458 So.2d 668 (La.App. 3rd Cir.1984); Butts v. Insurance Co. of North America, 352 So.2d 745 (La.App. 3rd Cir. 1977), writ denied 354 So.2d 206 (La.1978). However, in the present case, the evidence does not indicate that the evaluation was performed for the purposes of litigation.
Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278, 1282 (La.App. 3d Cir.1993).
An employer who deprives its injured worker the medical expenses necessary to ascertain his medical condition, as opposed to medical expenses incurred for purposes of litigation, cannot use the denial to escape sanctions. Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983); Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277 (La. 1993). Cf. Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278 (La.App. 3 Cir.1993) (litigation purposes). Because defendant did not perform its legal obligations, it is not entitled to use its lapses to justify its failure to make claimant whole under R.S. 23:1203. There is ample evidence to suggest that defendant had sufficient knowledge to pay for plaintiff's necessary medical expenses, yet refused to do so. See, e.g., Guillory v. Travelers Insurance Company, 294 So.2d 215, 217-218 (La. 1974). Cf. Johnson v. Ins. Co. of N. America, 454 So.2d 1113, 1119 (La.1984) (paid within sixty days).

Decree
Claimant's award of temporary total disability benefits is vacated and remanded for the taking of additional medical evidence and reconsideration of his disability under the proper legal standards, but the medical benefits and attorney fees awarded by the hearing officer are affirmed, with an additional $1,250 to be awarded for legal efforts spent on appeal. Defendant to be taxed with costs of these proceedings.
AFFIRMED IN PART, VACATED AND REMANDED IN PART.
NOTES
[1] Judge Lucien C. Bertrand, Jr., Retired, participated in this decision as Judge Pro Tempore by appointment of the Louisiana Supreme Court.
[2] There is no question that the hearing officer, considering the evidence as a whole, concluded that claimant showed by a preponderance of the evidence that he was entitled to temporary total disability benefits. But, aware that her judgment was premised on a lower threshold requirement than the law now requires, we cannot read into the judgment that she believed that claimant made his showing by the requisite level of clear and convincing evidence.
[3] Although defendant did not raise the matter, claimant indicated that he did occasionally perform housework and had gone to trade school for one year, for bookkeeping, a skill which he had previously used to earn a living. We need not consider whether claimant expressed a premature willingness to return to work, that is, before he was physically able to do so. (He would be by no means the first individual willing to work who, frustrations aside, obeyed doctor's orders that he refrain from doing so.)