763 So.2d 111 (2000)
Tissa M. WILTZ
v.
BAUDIN'S SAUSAGE KITCHEN.
No. 99-930.
Court of Appeal of Louisiana, Third Circuit.
June 19, 2000.
*112 Joslyn R. Alex & JoAnn Nixon, Alex & Associates, Inc., Breaux Bridge, LA, Counsel for Plaintiff/Appellant.
Jennifer M. Klein & John F. Wilkes, III, Borne, Wilkes, Dill & Brady, L.L.P., Lafayette, LA, Counsel for Defendant/Appellee.
*113 (Court composed of SYLVIA R. COOKS, JIMMIE C. PETERS and ELIZABETH A. PICKETT, Judges).
COOKS, Judge.
Tissa Wiltz appeals a judgment dismissing, with prejudice, her claim for weekly workers' compensation benefits, medical expenses, penalties and attorney fees. Finding the administrative judge manifestly erred, we reverse his ruling.

FACTS AND PROCEDURAL HISTORY
Tissa Wiltz, employed as a cook for Baudin's Sausage Kitchen, sustained injuries on July 27, 1994 when she slipped and fell on her buttocks while attempting to place a tray into an oven. Tissa, believing she was not seriously hurt at the time, completed her day at work. During the early morning hours of the next day, Tissa was awakened when she began experiencing severe pain in her back. She applied heat to her back, and "went to work, but could not do anything." Tissa's supervisor instructed her to return home. When the pain persisted, Tissa sought medical care at the Medical Center of Southwest Louisiana. She was examined in the Emergency Room, x-rayed, prescribed medication, and restricted to bed rest. Later, she was examined by Dr. Fournet who prescribed medication and therapy to treat her condition. Dr. Dewey followed up Tissa's care and ordered new x-rays and an MRI. The tests confirmed Tissa had a ruptured disc and Dr. Dewey recommended surgery. At the behest of the employer, Dr. Shepherd (an orthopedic surgeon) was retained to render a second opinion. He reviewed the tests and agreed with Dr. Dewey's findings and recommendation. Tissa then sought care from Dr. Cobb, also an orthopedic surgeon, who examined her on November 16, 1994. At that time, she was complaining of aching pain in her neck; numbness in her upper and lower back, both hips and legs; aching, sticking and burning pain in her lower back with pins and needles sensations in both legs; and numbness in the left arm and the fingers of both hands. Tissa told the doctor she fell the day before when her leg "must have given way because she woke up on the floor." Dr. Cobb noted the lumbar x-rays taken at the Medical Center of Southwest Louisiana just three days after the accident, and the later testing ordered by Dr. Dewey confirmed Tissa had "narrowing at the L4-5 and L5-S1 levels" with "a large extruded [herniated] disc at L4-5" and "degenerative disc disease at L3-4 and L4-5." Her cervical x-rays also "suggest[ed] a spondylosis at the C5-6 level." Dr. Cobb found she had a "symptomatic disc herniation" and the cervical spondylosis could have been symptomatic as well. He recommended she undergo a "laminectomy and disc excision at L4-5 on the right with a fusion."
On February 21, 1995, he performed the surgery and noted, in addition to the herniated disc detected earlier, Tissa had "marked instability with fenestration of the ligamentous structure and incompetent facet joints" at the L4-5 level. The doctor inserted screws in the pedicles at L4-5 and plates with T-connectors. He also inserted in the beds at the incision site "[a]n EBI and Collograft, as well as [a] bone graft" taken from Tissa's leg. An EBI is a battery-powered bone graft stimulator.
For a time, the doctor noted Tissa was "doing well" after surgery, except she initially complained of pain in the right leg and back discomfort. In July, 1995, Dr. Cobb found Tissa was still healing, "though she [did] not have as nice a dense bone reaction," as expected at that stage. He recommended she complete a re-conditioning program and referred her to a physical therapist. When Tissa returned to Dr. Cobb in September, 1995, she was complaining of a "different type of pain" in the graft area, buttocks, and leg. X-rays revealed that the fusion was not "solid yet." Dr. Cobb could not determine the exact etiology of the pain complaints, but stated it was not unusual for patients to *114 experience continued pain at this stage. In November, Dr. Cobb felt Tissa had benefitted all she could from the therapy program and he decided to allow "her to work primarily on her own with some of the exercises that she had learned." In February, 1996, Tissa returned to Dr. Cobb, who noted the fusion was solid, but she was still complaining of pain in the back and leg. Dr. Cobb recommended removal of the EBI and referred her to Dr. Hodges for assistance in pain management because of her persistent complaints.
Dr. Hodges specializes in physical medicine and rehabilitation. On Tissa's initial visit in March, 1996, Dr. Hodges noted she was suffering from pain over the right hip consistent with a degree of bursitis and low-grade depression often experienced by "patients that have chronic pain." He prescribed Zoloft and Pamelor to aid her in sleeping and coping with the depression. He also injected her low back with doses of Celestone and Marcaine and recommended a Functional Capacity Evaluation (FCE) to determine Tissa's physical limitations and how she might "reintegrate into the job environment." In April, 1996, Tissa returned to Dr. Hodges who discontinued her use of Pamelor, prescribing instead Ambien for sleep and Hydrocodone for pain. He found she was "still having significant mechanical low back complaints" with "right leg pain that seemed to go throughout the history of her treatment with [him]." Dr. Hodges performed the FCE during that visit and concluded Tissa's "validity and symptom magnification scores were below average resulting in an invalid test." Asked later to explain this conclusion, Dr. Hodges stated:
A. Well, there are a series of tests that we do, basically looking for symptom magnification or validity scores, which we do a variety of tests that would validate a person's putting forth 100 percent effort. And, in this case, she tested out at 56 percent. And to have a valid study, we look at 75 percent or greater. So I think this put her into an invalid range. And so from that, we have to kind of assess what she did do and then determine from that what she would perhaps be capable of doing. And, you know, it's-in her defense, many times patients don't understand what they have to do and there can be communication problems there, to a certain degree. But, anyway, the test was invalid.
Q. Okay. Are you saying she didn't understand the test?
A. No, I'm not sayingI'm not saying that. I don't want to be misinterpreted that she overtly tried to throw the test or not put forth an effort. I mean, I don't want to say that in no uncertain terms. I can't-I can't say that. I mean, I think we have to look at, it was an invalid test, what are the reasons? Was she malingering or was she having pain and couldn't be consistently consistent, did she not understand. There are a lot of issues we have to look at.
Q. So what you're saying is, all you know is that the-she only had a 56 percent
A. Right. Right.
Without the benefit of a valid test score, Dr. Hodges related in Tissa's case he attempted to "estimate [what he thought] she could do." He found she could perform light duty work, with restrictions on stooping, squatting, bending, pushing, and pulling. The EBI was removed by Dr. Cobb from Tissa's back on September 2, 1996.[1] But, she returned to his office that month still complaining of pain in her back and leg. When asked whether any objective findings existed at that time to explain Tissa's continued complaints, Dr. Cobb responded "[l]ots of them, yeah." He attributed her pain to "the surgery for one (1) thing, the compressed nerve that she had and the disc herniation, and the instability *115 of her spine." Commenting further, he stated the pain was probably associated with:
... taking the muscles down, but also she seems to have some persistent nerve symptoms in the right side. So the etiology of the leg pain would probably be two-fold. One would be some referred pain from the graft site which seemed to gradually subside, and some residual radiculitis from the L5 nerve.
In December, 1996, Dr. Cobb noted Tissa "had chronic nerve changes." When asked to explain this finding, the doctor stated:
Chronic would mean that, that she was having some nerve issues regarding the symptoms and findings over six (6) months. And nerve changes would indicate she is still having the pain in her right leg from the compressed nerve. That the changes that would be scarring of the nerve and edema, intradural adhesions, and fibrosis.
The doctor opined there is "no way to go after the nerve and make it normal when it is scarred like that from compression." He cautioned if the residual discomfort in Tissa's right leg was related to the original compression of the nerve, "she was probably going to have to cope with that level of pain." He instructed Tissa to return on an "as needed basis."
Dr. Hodges continued to monitor Tissa during the months that followed. Tissa had a hypertensive stroke several weeks prior to her February 25, 1997 visit with Dr. Hodges. His notes reflect she had "mild right hemiparesis that seem[ed] to be resolving." Dr. Hodges continued her in a "limited therapy program" for her lower back. Tissa's "persistently consistent unabating" pain complaints prompted him to order follow-up testing. Dr. Hodges also noted during the visits which followed "she [had] significant spasm at the lumbosacral junction bilaterally particularly on hyperextension rotation." He administered Marcaine injections in the L5-SI lumbar region which provided her "immediate pain relief." But Tissa's pain in the lower back, buttocks, and legs persisted. The doctor noted spasms on each subsequent visit. When Tissa arrived at the office on September 2, 1997, she was complaining of "right lower extremity pain... radiating into the posterior lateral thigh and hip." The pain, as she expressed, "tend[ed] to be at its' zenith in the afternoon and evening hours and definitely [was] hampering her during the course of the day with regard to her daily activities." The MRI results confirmed Tissa was suffering from a right recurrent disc herniation at the L4-5 level "with [displacement and] compromise of the right L5 nerve root." Asked to explain how this might have occurred "in light of the surgery she already had," Dr. Hodges stated:
Okay. I have the actual report now. Okay. It says recurrent-at the L4-5 level, recurrent central and right lateral focal disc herniation with displacement and possible compromise of the right L5 nerve root. And, well, basically she had a discectomy laminectomy where they went in and took out part of the disc and took off the lamina on the back here, or at least a portion of the lamina. And after that occurs, you know, I'm sure the pressure was taken off of the nerves in that area. But you can have portions of the disc that remain that will extrude out or bulge out. And that's what we saw in this case on 8/26/97, is that at the L4-5 level, which is basicallywhich the L4-5 level is here. And it will pick up and catch the L5 nerve root as it exists, and I think that's what we are seeing. I think that's what explains a lot of her ongoing persistent complaints. And we also did an EMG test that-you know, MRI's look at anatomy, they look at structure. You can do an MRI on a skeleton or you can do an MRI on a living person. But it doesn't discern living tissue, it looks at structure. Whereas the EMG test that we did, it looks at physiologic living tissue. And we were able to, from that, glean that *116 she had evidence of a L5 nerve root problem on that right side.

And you like to take anatomic and physiologic testing and see them mesh up, so to speak, as far as you find an L5 nerve root problem on your physiologic testing, and then you have an L4-5 disc that looks like it's catching the L5 nerve root. And you like to see all of that kind of mesh up, which, I think, it did.
Dr. Hodges referred Tissa to Dr. Cobb for possible surgical intervention.
Dr. Cobb examined Tissa on November 5, 1997 and agreed she had a significant recurrent disc herniation. He commented that Tissa was "continuing to complain bitterly of pain in her right leg." His notes also reflect he "talked to her about doing a micro-discectomy at the L4-5 level," and she expressed a willingness to "go ahead" with the procedure. The doctor believed, "based on the fact that it look[ed] like [she had] a recurrent disc, [he] should be able to give her some help with surgery." On the same date, he requested written authorization from the employer's insurer to proceed with surgery.
The insurer did not respond to Dr. Cobb's request for authorization to proceed. Instead, it requested a second opinion from Dr. Watts, an orthopedic surgeon, who examined Tissa on December 2, 1997. Dr. Watts found she had "chronic low back pain" which he thought might be caused by the screws inserted in her spine, noting though "it[was] difficult to see on the oblique view the direction of the screws." We surmise from the record, aside from x-rays, the doctor was not provided copies of the MRI and EMG test results nor the reports of Cobb and Hodges. Obviously limited by the information supplied him, Dr. Watts candidly stated, "perhaps a CT scan might help," and "[a]dditional information would help in evaluating this patient, though other information is not available at this point." The information was never forwarded to the doctor and the insurer did not authorize further diagnostic testing. Other than noting Tissa was not "a candidate for any type of heavy lifting, bending, and twisting in the near future," Dr. Watts did not render an opinion at that time regarding Tissa's ability to work.
Dr. Hodges saw her on December 18, 1997 and January 14, 1998. On each occasion, he found she was having significant "unabating right lower extremity pain consistent with her L5 radiculitis" and he elected to administer, during each visit, injections of Celestone and Marcaine to provide her some relief. His January notes reflect he "really [felt] she need[ed] to consider surgical intervention in the very near future."
Although Dr. Watts' report did not contradict the positive medical findings of Drs. Hodges and Cobb, the insurer filed an application with the Office of Workers' Compensation requesting an Independent Medical Examination (IME). That office appointed Dr. Jeffery Fitter, an orthopedic surgeon, as the IME examiner. Tissa was "three months pregnant" when she visited Dr. Fitter's office on March 21, 1998. Dr. Fitter, explaining what he thought prompted Tissa's referral to his office, stated: "I believe there were some differing opinions among the surgeons who had previously examined and treated her." However, as noted, the medical records show none of Tissa's treating physicians disagreed regarding her care.
After examining Tissa for less than fifteen minutes,[2] Dr. Fitter concluded:
My diagnosis on this patient was chronic back pain syndrome, with symptom magnification and contradictory physical findings, and also a history of right sided stroke. I felt that Ms. Wiltz was at maximum medical improvement and that she should be treated conservatively for her residual pain complaints. I did not believe that she needed any more surgery on her back. Her response *117 to the first operation was poor, and with this history, as well as her contradictory findings on physical examinations, I did not think a re-exploration of the L4 disc could be expected to improve her chronic complaints significantly. She did have a well-documented lumbar disc rupture initially and underwent extensive, although unsuccessful surgery, and according to A.M.A Guidelines, Fourth Edition, this would leave Ms. Wiltz with a fifteen [per cent] permanent impairment of the whole person.
When asked to explain why he did not think surgery was a reasonable option in Tissa's case, Dr. Fitter stated:
The main basis for this is that I found nothing on my physical examination to indicate a recurrent disc rupture. No neurologic findings.[3] And secondly, patients such as Ms. Wiltz who tend to magnify their symptoms and present with contradictory finds, as a group in general don't do well with surgery. So that's another reason. And thirdly, the patient had already had a major operation on her back and had done very poorly following this, and also her postop at some point appears to have been complicated by a stroke. So the patient was probably a poor medical risk for additional surgery. So I just didn't think it was a good idea for this patient to consider another operation.
But Dr. Fitter's objection to further surgery in Tissa's case mellowed, somewhat, when he was asked:
Q. Doctor, even taking out the inconsistent testing and the magnification, let's just assume that that factor did not exist, would you still not recommend surgery for this patient, in light of the other three factors?
A. My recommendation against surgery would not be as strong, but I think it would still be present. Now, I did not have the opportunity to see her postoperative MRI scan, so I'd have to qualify my answer with that. If her MRI again showed a large disc rupture, then that would be some evidence of some findings in favor of surgery, but with all the other factors involved with this patient, I still would recommend against it. I just don't think the patient would improve with another operation. (Emphasis added).
In June, 1998, Tissa returned to Dr. Hodges' office. He noted in early April she "spontaneously aborted" a twenty-three weeks fetus. The medical records indicate Tissa and her treating physicians were not aware of her pregnancy until mid-March, 1998. She continued to take the medication prescribed for her pain by Dr. Hodges, and the medication prescribed by other physicians for her hypertensive and diabetic conditions until two weeks before the premature delivery. During that period, she began taking the medications "every other day, because she was unsure if they would harm the baby." On April 2, 1998, she arrived at the University Medical Center located in Lafayette, Louisiana, "hypertensive, with an elevated glucose level, cramping and complaining of vaginal bleeding." The prognosis for delivery of a viable fetus was poor; and, she aborted it four days later.
Dr. Hodges also noted during the June visit "she [was] obviously depressed [and] having significant back complaints." He prescribed various medications for pain and depression and commented "that it [was] imperative that we deal with her pain complaints as well as her concomitant depression at this point."
The insurer, however, responded by reinitiating rehabilitation services and requesting the provider to identify and locate light duty employment for Tissa. Mary *118 Adair was assigned this task and forwarded notices to Tissa and her attorney identifying the available light duty jobs offered by various employers. Tissa denies receiving the notices; but the record confirms her attorney was notified by certified mail on each occasion.
The employer subsequently discontinued paying Tissa weekly benefits, alleging the medical evidence shows she is capable of returning to light duty employment. Tissa disagreed and filed a complaint with the Office of Workers' Compensation on August 6, 1998 seeking an order directing the employer to reinstate her weekly benefits, to pay the medical costs associated with the surgery recommended by her treating physicians, and to pay penalties and attorney fees for its wrongful discontinuance of all benefit payments to her.
The workers' compensation judge eventually dismissed Tissa's claim with prejudice. Tissa lodged this appeal and argues that the judge's decision is manifestly erroneous. We agree the record does not support the judgment entered below.

STANDARD OF REVIEW
The Louisiana Supreme Court instructed in Freeman v. Poulan Weed Eater, 93-1530, p.4-5 (La.1/14/94); 630 So.2d 733, 737:
In a workers' compensation case, as in other cases, the appellate court's review is governed by the manifest error or clearly wrong standard. Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992). A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Stobart v. State Through DOTD, 617 So.2d 880,882 (La.1993). The appellate court must determine not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one after reviewing the record in its entirety. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987); Rosell, supra; Stobart, supra. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, supra; Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Stobart, supra.

ANALYSIS

A.

Temporary Total Disability Claim
Rejecting Tissa's claim for temporary total disability benefits, the judge found:
Dr. Watts gave claimant a 20% wholebody impairment rating. He also approved each of the jobs identified for claimant (Defendant Exhibit 2, medical records of Dr. Gerald Watts).
Even Dr. Cobb, claimant's treating physician, agreed claimant could perform the jobs located for her and approved all job descriptions (Defendant Exhibit 5, deposition of Dr. Cobb, pp.31-34). Dr. Cobb further agreed with Dr. Fitter that claimant may have been magnifying her pain complaints (Defendant Exhibit 5, deposition of Dr. Cobb, p. 19, p 25).
Claimant has been examined by a multitude of physicians, and three out of four physicians have indicated claimant can perform some type of work and approved the jobs identified. Although Dr. Hodges, a specialist in pain management, did not sign off on the job descriptions, he testified in his deposition that he would not be against claimant attempting the jobs identified and relates his reluctancy to her pain complaints (Plaintiff Exhibit 3, deposition of Dr. Hodges, p. 24, 25). Considering the physicians' testimony and medical records, there is no objective medical evidence indicating claimant is unable to engage in any employment. This Court *119 finds claimant did not carry her burden of proof required to be entitled to temporary total disability benefits.
The record evidence contradicts the ultimate factual conclusion of the judge in several particular respects.

1. Dr. Watts' Deposition Testimony and Reports.
Attached to Dr. Watts' December 2, 1997 examination report is a form entitled "Waddell's Sign of Non-organic Spinal Pain." Under the diagnosis section of this form, Dr. Watts circled "Lumbar Severe" and then drew a vertical line to the following handwritten comment: Pain RT Lower Back/Rt Leg with decreased sensation Rt leg (whole). On the form showing results of the "Patrick's Test" and "Lasegue's Test" performed by him, the doctor circled "moderate/severe pain" and noted Tissa's responses to the testing were "appropriate and consistent." Although Dr. Watts expressed in his report that Tissa had a "permanent impairment and probably has 20% permanent impairment to the body as a whole," he also stated she has "chronic low back pain ... with leg [and] hip ... pain." Although he approved the jobs identified by Adair, he noted Tissa "may have difficulty with repeated lifting" twisting and bending and stated "considerable caution should be considered." He also cautioned that he had not seen Tissa "since [December] 2, 1997; therefore, [his] opinions [were] based on that date."

2. Dr. Cobb's Deposition Testimony and Reports.
When Dr. Cobb was asked "if prior-other doctors who have examined Ms. Wiltz noted that they found inconsistencies in her complaints, would you have reason to doubt that," he responded: "Well, I'd like to look at and see what they say is inconsistent, because everything seemed to be consistent in terms of what I found.... I never did find that she had a real marked inappropriate illness response." Dr. Cobb also stated he made "lots" of objective findings which confirmed Tissa's subjective complaints of pain. Although he approved the job identified by Adair, he too cautioned "... she has the functional capacity to perform the job but whether she can or not, I don't know." Dr. Cobb further explained:
Well they would be the type of jobs that I think a patient who has a lumbar fusion could perform without any catastrophic events occurring. You know if she came in and said I'd like to do this this job, I'd say I don't think there is any problem with it. It doesn't seem like it is that heavy and would tell her that she could try it.
An intervening event has occurred in Tissa's case, albeit the defense might argue not a catastrophic one. Diagnostic testing confirmed she has a recurrent disc herniation.

3. Dr. Hodges' Deposition Testimony and Reports.
Addressing questions posed to him regarding Tissa's ability to perform light duty work, Dr. Hodges stated:
Q. What I'd like to do is, as you can see, they are very brief.
A. Yes, ma'am.
Q. I'd like to take a look at these.
A. Yes, ma'am.
Q. And when we're discussing these, I mean, we're all aware that Ms. Wiltz has multiple health problems, including the diabetes, hypertension 
A. Right
Q. the history of the stroke.
A. Right
Q And when we're discussing these, basically, what I'm looking at, is your opinion as to her ability to do or to not do these jobs based upon her problem with the back.

A. Right.
Q. Okay. The first one, she would be a crew member job description. Light duty position, no lifting over 20 pounds. *120 Mostly standing and walking with an occasional sitting. Now, Dr. Cobb signed off on this job in August of '98, and this job is to basically prepare and package food for customers. Is that something, based upon her current back condition, that you would agree or not agree that she is capable of doing?
A. Well, it'sas I told the rehab person this morning, I would be hesitant because I haven't seen Tissa in many months now. And secondly, I do believe that she has an on-going problem with her back and her leg. You know, again, setting aside, I know she has multiple medical problems. She has, you know, uncontrolled hypertension, she had a hypertension stroke, early diabetes. You know, she is overweight, in poor general health. And then adding insult to injury with the back problem and the persistent radiculitis. But I understand that you need to separate the parts and the pieces, and that's what I'm trying to do here.

Q. Let me rephrase the question then. As of the last time you saw her and your examinations and findings from your
A. Yes, ma'am.
Q. last visits with her, would you agree or disagree that she was capable of performing that job?
A. I would be very reluctant to sign off on a job description for her with her persistent pain complaints she was having. I might not be against her trying it, but I would not give any guarantees as to her staying out there. And I wouldyou know, in 13 years of practice and seeing,14,000 patients, and I deal a lot with disability issues and things like that, I really think that Ms. Wiltz is basically disabled, and disabled from her back condition and leg condition. She might be able to do something, and I wouldn't be against perhaps trying this, but in no way would I sign off on it full-time unconditionally. I would perhaps let her try it on a trial basis and see if she could handle it.

Q. Okay. Let me clarify. So are you saying that you would not sign off on any light duty job description?
A. Well, you know, maybelet me go back. I had seen Ms. Wiltz from 1996 over a several year period. And during that time, you know, again, my job is toin this office, I work with the orthopaedist and I take the patients and try to deal with their pain problems that they might have, any residual problems, and push them back out there to work. And I try that in earnest, and I did with Tissa. You know, when we started out, we put on a hard push to get her back out there, and she just didn't have it in her. And, you know, again, she had some multiple medical problems to arise during that period of time, but she really didn't. And if she did, I would have her out there working. You know, I believe everybody should work. I mean, that'syou know, but I think the longer that I dealt with her and the more I got to know her and see her overall medical condition, it became apparentand then the persistent radiculitis, it became apparent to me that it's not too hopeful we are going to be able to get her back out there. You know, and Tissa, she is young, I mean, in her early 30's, and she is kind of worn out.

Q. When you say, "she didn't have it in her," I'm not sure exactly what you mean by that.
A. Well, I mean, just from the pain complaints, the persistent pain complaints. I think that we had documented both on, you know, physiologic and anatomic testing. I just don't know that she could stand working eight hours a day, five days a week for the other person. You know, and it's a light duty position, but, you know, it's mostly standing and walking, and I just don't think it's realistic.

Q. Well, let's look at the next job description. That's one of a server in a restaurant.
A. Yes, ma'am.

*121 Q. It involves occasional sweeping and then serving food to customers.
A. Yes, ma'am.
Q. Would your opinion be the same or different for that position?
A. It would be basically the same, you know. Again, in reviewing crew person, going through the list here: crew person, waitress, hostess. You know, I wouldn't be against her going and trying something like this. I never say no. But my gut feeling, and again, in dealing with thousands of patients over the last decade, I just don't see this lady being able to be consistently consistent in a work environment over the next ten years. It's justit ain't going to happen.

Q. And that's your opinion if you look solely at the back?

A. Yes, ma'am.
Q. Now, as you can see from these job descriptions, Dr. Cobb did sign off on these in August of 1998.
A. Yes, ma'am.
Q. Would you defer to Dr. Cobb's decision at that time
A. Well
Q. when he signed off on these?
A. you know, I'm in practice with Dr. Cobb. He and I and Dr. Blanda and Dr. Muldowny all have a practice as a law group might have or whatever. But, you know, I did see Tissa on a fairly regular basis because of her complaints, and I did develop a rapport with her over a period of a couple of years and got to know what she was capable of and wasn't capable of. Initially seeing her, I had the impression, yes, we are going to be able to push her and get her back out there, and that didn't quite happen. You know, I respect Dr. Cobb's judgment and in no way would I try to say that he is wrong or whatnot. That's his opinion, and I respect that. And my opinion is, I just don't know that she would be able to handle it. She might, but I would not want to, knowing her as I did, come out and say that she was going to be consistently consistent in working an eight hour, five day a week for the next ten years or something like that.
. . . .
Q. And just to sum this up. So since the FCE in April of '96 where you said she was capable of doing light duty work andwhat was the last date that you saw her?
A. The last date, I think, looks like June of 1998.
Q. June of '98?
A. Yes, ma'am.
Q. So from April 10th of '96
A. Right.
Q. and June of '98
A. Uh-huh (yes).
Q. what has changed
A. Well
Q. to make her now incapable of doing light work?
A. Yes, ma'am. I understand what you're saying. We initially started the push to get her back to work, which I do with patients. We deal with their pain problems, and we started pushing toward return to work. She couldn't handle that. We tried it many number of occasions. And when a patient [sic] tell me, I'm still hurting, I can't do that, I can't do that, I have to listen to the patient. And, again, she was consistently consistent in her presentation. And we worked her up, and sure enough, she has a problem there. And I think in the two years that I saw her, I could see and developed a rapport with herthat it was going to be difficult for her, if she didn't have surgical intervention, and perhaps even with surgical intervention, to go back out there and work, you know, on a consistently consistent basis for eight hours a day, five days a week, over the next 10 years, or 20. You know, her work history, she is in *122 her early 30's. She has got another 30 years to work, and ain't no way.
Q. Are you aware, in that time, of any actual return to work attempts?
A. I think we did try to have her go back to work, if I recall. And again, I didn't review in detail the notes. But I think we did try to have her go back out there once or twice perhaps. Now, I might be wrong, but I think so.
Q. Okay. And you many not recall since you don't have a good recollection of those attempts, but I'm going to ask anyway. Do you recall whether or not the jobs that may have been attempted were actually within her job descriptions or within her restrictions? Excuse me.
A. They may have been a bit above, perhaps. And I might be wrong, but I think she did try to go back and do some work. I might be getting her confused with someone else, but I don't think so. But, you know, as far as letting a patient go and try something that maybe they cannot handle, but we will let them go try it and be sure. But in getting to know her over the two years and see how she evolved and that problems she was having, I just, you know have my doubts that she would ever be able to do anything out there ... (Emphasis added.)
La.R.S. 23:1221(1) addresses entitlement to Temporary Total Disability Benefits. It provides:
Compensation shall be paid under this Chapter.... with the following schedule of payments:
(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) ... compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self employment ... including but not limited to ... employment while working in any pain.
(c) ... whenever the employee is not engaged in any employment or self-employment... compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment ...
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonable reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required....[4]
Because the Workers' Compensation judge ultimately found "there is no objective medical evidence indicating claimant is unable to engage in any employment," he concluded she had "not carr[ied] her burden of proof required to be entitled to temporary total disability benefits." This he found, though the record establishes Tissa is suffering from a recurrent disc herniationa medical fact amply proven by objective evidence. The only evidence offered to dispute this "objective" medical reality was Dr. Fitter's failure to detect any neurological signs of a *123 recurrent disc during his examination of Tissa. But Dr. Fitter's examination of Tissa lasted less than fifteen minutes and he did not "see her postoperative MRI scan" and conceded if the MRI revealed a large disc rupture "that would be some evidence of some findings in favor of surgery."
Dr. Fitter's opinion regarding Tissa's present medical condition is entitled to little weight. See Alfred v. Mid-South Mach. Inc., 594 So.2d 937 (La.App. 3 Cir. 1992). We have said "that positive findings should be afforded greater weight than negative findings as to the existence or nonexistence of a particular medical condition." Danzey v. Evergreen Presbyterian Ministries, 95-167, p. 10 (La.App. 3 Cir. 6/7/95); 657 So.2d 491, 497. See also, Campbell v. Luke Constr. Co., 465 So.2d 688 (La.1985). In Johnson v. Temple-Inland, 95-948 (La.App. 3 Cir. 1/31/96); 670 So.2d 388, writ denied, 96-544 (La.4/19/96); 671 So.2d 919, we held although the court-appointed expert's opinion must be considered prima facie true, the opinion of the court-appointed expert is not conclusive. We also said in Menard v. Winn Dixie Louisiana, Inc., 93-1497, p.13 (La.App. 3 Cir. 6/1/94); 640 So.2d 775, 783:
... [W]hile the law permits the hearing officer to appoint a physician to perform an independent medical examination, it does not require the hearing officer to accept his conclusions. A hearing officer simply does not cede the responsibility afforded [his] office when [he] chooses to appoint an independent medical examiner. (Citations omitted)(Emphasis added).
Further, it has been a long held tenet "that the testimony of a claimant's treating physician should ordinarily be afforded more weight than that of an examining physician." Watkins v. Asphalt Associates, Inc., 96-249, p.9 (La.App. 3 Cir. 12/4/96); 685 So.2d 393, 398, Johnson, supra, 670 So.2d 388. The reason for this preference is "that the treating physician is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations." Wells. v. Allstate Ins. Co., 510 So.2d 763, 767-768 (La.App. 1 Cir.), writ denied, 514 So.2d 463 (La.1987). Dr. Hodges and Dr. Cobb have been Tissa's primary treating physicians for well over five years. Dr. Hodges repeatedly emphasized Tissa "has a bonafide problem in [her] right lower extremity from that disc" which explains why she "continually [has] pain complaints." Based on the physiologic and anatomical testing he conducted, Dr. Hodges remained convinced it is simply unrealistic to believe Tissa can perform light duty work eight hours a day at this stage.
Still, the defense points to the invalid FCE and argues Tissa is magnifying her symptoms. While an invalid FCE might indicate such, in some instances, Dr. Hodges unequivocally stated in Tissa's case he did not "want to say that in no uncertain terms." "In her defense," the doctor stated, "many times patients don't understand what they have to do and there can be communication problems." In other instances, the doctor related the patient might be "having pain and couldn't be consistently consistent." Defendant's position has not wavered though the record contains physiological and anatomical test results which positively prove Tissa's "persistent pain complaints" were not imaginary, but very real. As Dr. Hodges expressed "sure enough she has a bonafide problem." He and Dr. Cobb agree "not until that's remedied ... will she have any significant relief." And even then, Dr. Hodges doubts Tissa will be able to return to full-time light duty employment. Dr. Hodges' earlier finding that Tissa could perform light duty work, by his own admission, was not well premised. His conclusion was an intelligent "estimation" of what she could perform which he rendered before discovering Tissa was suffering from a recurrent disc herniation.
*124 The workers' compensation judge also found Tissa did not establish that the recommended surgery was necessary. First, he stated Dr. Watts did not consider Tissa "to be a surgical candidate." However, the record reflects only Dr. Fitter objected to Tissa undergoing another surgery. His objection rested on an ill-founded suspicion that her pain symptoms were largely magnified; and, his belief that she did not benefit from the first surgery. For an "expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record." Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315, 318 (La.App. 4 Cir.), writ denied, 629 So.2d 414 (La.1993). We know the MRI and EMG results show Tissa has a recurrent disc herniation. Dr. Cobb, undeniably more familiar with Tissa's improvement after surgery, also testified:
Well, if you look back in the history of her, her complaints, at one point she was really totally pain free as far as her leg was concerned ... and that her back was doing very well. And at some point, she started having some recurrence of the leg symptoms, so the fact that there may have been developing some additional nerve compression. So she probably would respond to taking this pressure off the nerve as she did the first time.
Second, the judge noted Tissa "suffers a myriad of health problems ... includ[ing] high blood pressure, diabetes, depression, and [had] a pregnancy resulting in a spontaneous abortion."[5] An employee's pre-existing disease or infirmity does not disqualify her from receiving workers' compensation benefits if the work-related injury either aggravated and accelerated or combined with the disease or infirmity to produce the disability for which compensation is claimed. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985). This is true even when an employee's pre-existing emotional stress or mental condition is aggravated by a "work related accident." See Chandler v. American and Foreign Insurance Company, 257 So.2d 825 (La.App. 3 Cir.1972). Tissa's hypertensive condition, according to Dr. Cobb, was "under pretty good control," but she experienced increased hypertension after surgery. Her hypertension continued to accelerate and she eventually suffered a stroke. Dr. Hodges also testified, although Tissa had multiple medical problems including hypertension, a hypertensive stroke, early diabetes, and "she is overweight [and] in poor general health," the back problem and the persistent radiculitis "add[ed] insult to her injury." Tissa, according to Dr. Hodges, is now "disabled from her back condition and leg condition."
Finally, the judge states Dr. Cobb "considering each of these health factors, testified he would not have performed the surgery at that time." But the questions posed to Dr. Cobb regarding the health factors referenced by the judge were framed to elicit skewed responses. Dr. Cobb's responses, when reviewed in whole, do not support the judge's factual summation. The doctor testified:
Q. When you recommended another surgery in November of 1997, were you aware that Ms. Wiltz was pregnant?
A. No.

*125 Q. Okay. You wouldn't have performed the surgery if she was pregnant; is that correct?
A. I think I would probably wait until after.
Q. Okay. Were you aware that Ms. Wiltz subsequently suffered a miscarriage of that pregnancy?
A. No, I have not seen or heard from her since November.
Q. Okay. Did you know that Ms. Wiltz smoked?
A. I think so, yeah. Let's see.... Half a pack a day is what she said.
Q. Does this have any effect on your opinion regarding surgery?
A. My opinion, no.
Q. Okay. What about your decision to perform surgery at that point? Would you have wanted to ween her off the cigarettes before you performed surgery?
A. Yes, I think so. I probably would like to ween her off of her cigarettes, get her hypertension under control, and have her lose maybe a hundred pounds. Sometimes all those things can't be accomplished so that's why we take all theuse all the techniques that we have to get the fusion to heal. But, yes, ideally, you know, there are a lot of things I would like to do with patients before operating on them.
Q. And is that something that you would've considered doing, or were you ready to perform the surgery right there?
A. Tell them to quit smoking. Very few people do, but we tell them to.
Q. Okay. And it would have been ideal to get the high blood pressure under control, also, before performing surgery?
A. Well, make sure it was under pretty good control, apparently she was taking medication for it, but she had some increased hypertension following surgery that wasthat was treated.
Q. And if Ms. Wiltz had tested positive for marijuana, would that have affected your decision?
A. Yes,
Q. regarding surgery?
A. I think I would have preferred her to get some help, get drug-free before surgery.
Q. What if you had known about her history of suicide, would that have affected your
A. I probably
Q. decision regarding surgery?
A. would have had a consultation with her psychiatrist to see how stable she was, was this an event that occurred in her life, or did she really have a diathesis toward severe depression.
Q. What about her history of stroke? Did you consider this as any, as a factor in your decision to perform surgery?
. . . .
A. I think it does figure into the mix in terms of risk factors, yes.
. . . .
Q. So, going back to when you recommended this surgery, if you had taken into consideration her diabetes, which you knew about; her stroke, which, I believe you testified that you didn't know about, correct?
A. That's right.
Q. Okay. Her depression and her history of suicide, at that point, would you have really considered doing surgery, or would it have been something you would have maybe waited to see how she was doing in the future?
A. Well, I thinkI think we have to take all those things into consideration, in terms of whether or not to do the surgery, in terms of the pre-operative evaluation because if the risks were unacceptable, then we probably would have postponed the surgery until which time that these things were stabilized.
We are satisfied when the employer ceased paying Tissa benefits on June 30, *126 1998, her work related condition had not resolved to the point that continued, regular care by a physician was not required. Tissa's residual functional ability to attempt the work identified by Adair did not change her temporary total disability status. As noted in Sept v. City of Baker, 98-1190 (La.App. 1 Cir. 5/18/99); 733 So.2d 748, the ability to work is not mentioned in La.R.S. 23:1221(1)(d). That factor becomes controlling only after a claimant's condition has stabilized to such extent that it is reasonable to conclude further medical care will serve no useful purpose in restoring the patient's health or reducing the effects of the disabling injury. Tissa simply has not reached maximum medical recovery. The fact that Dr. Cobb might have delayed the recommended surgery if the risks were unacceptable in Tissa's case at that time did not change her medical status. Her condition has not stabilized.
The record contains overwhelming evidence that Tissa remains temporarily and totally disabled and the surgery recommended by her treating physicians is reasonable and medically necessary.

Penalties and Attorney's Fees
A claimant's entitlement to penalties hinges on whether the employer or its insurer "reasonably controverted" the claim for benefits. La.R.S. 23:1201(E); Johnson v. Vinson Guard Serv. Inc., 92-2187 (La.App. 1 Cir. 3/11/94); 636 So.2d 914.[6] To successfully establish a claim for attorney's fees, a claimant must show the insurer "arbitrarily and capriciously" denied or discontinued benefits. La.R.S 23:1201.2; Johnson, 636 So.2d at 914. Whether the refusal to pay benefits warrants the imposition of penalties and attorney's fees is a factual question which should not be disturbed on appeal absent manifest error. The workers' compensation judge found the request for surgery was reasonably controverted and the insurer was not arbitrary and capricious when it decided to discontinue weekly benefits because as he found:
... [D]efendant demonstrated at trial, the availability of several jobs; that the jobs were open and available; that the jobs were within claimant's physical capabilities and geographic location; and that the jobs paid 90% of claimant's preinjury wage. Vocational rehabilitation services were provided to claimant for two years. Ms. Adair made numerous efforts to assist claimant with her job search, but to no avail. The Supreme Court, in Banks, concluded that termination of benefits was not arbitrary and capricious, or without probable cause, even when their standard was not met. The same holding is true when their standard is met. Thus, this Court finds entitled to penalties or attorney's fees.
We have found the judge's ruling denying Tissa's claim for surgery and weekly benefits was not reasonable in light of the record reviewed by this court. His view of the evidence was not a permissible one; and, in many instances, we found no basis for his factual recitations. Our decision, however, does not obviate the need to determine whether the employer and insurer reasonably controverted Tissa's claim and whether they acted arbitrarily and capriciously in denying her all benefits. As framed by the court in Watson v. Amite Milling Co., 560 So.2d 902 (La.App. 1 Cir.), writ denied, 567 So.2d 614 (La.1990), to determine whether the employee's right to benefits was reasonably controverted by *127 the employer we must endeavor to answer the following question:
[G]iven the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were not due the employee. Stated another way, did the employer or his insurer have sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant.
Although, arguably at best, the employer and its carrier may have had a negligible basis to dispute Tissa's claim for continued temporary total disability benefits, the record convinces us their decision to discontinue paying Tissa any benefits was arbitrary and capricious; and they failed to "reasonably controvert" the positive medical evidence weighing in her favor.
The evidence undisputably establishes that Tissa has substantial chronic pain. All the physicians who examined her, including Dr. Fitter, agreed on this medical fact. The minimum standard the employer must comply with to establish his burden of proving job availability outlined by the Supreme Court in Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97); 696 So.2d 551 is not all that is required in a substantial pain case. The fact that an employee might have the residual physical capacity to perform work and earned at least 90% of her pre-injury wage is not dispositive because La.R.S. 23:1221(3)(c)(ii) states "if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment." None of the physicians testified that Tissa could perform the jobs defendants alleged are available without experiencing substantial pain. Tissa presented "clear and convincing" medical evidence that she is suffering from a recurrent disc herniation; and, she is experiencing persistent severe pain every day. The employer and its insurer had a duty to investigate whether Tissa's constant pain would render her unable to performed the jobs they insist were available before opting to discontinue paying her all benefits. Their failure to do so was unreasonable, arbitrary and capricious. Defendants "had a duty to investigate and make every reasonable effort to assemble and assess factual and medical information in order to ascertain" whether Tissa's claim for benefits was still viable. Allen v. Misco Paper, 27,146, p. 7 (La.App. 2 Cir. 8/23/95); 660 So.2d 175, 181. Defendants' obvious avoidance of this issue when questioning the physicians speaks volumes on their failure to reasonably controvert the medical evidence they knew existed. The records in their possession should have placed them on notice that Tissa was entitled to "some type" of benefits since she could not return to work without experiencing substantial pain. The decision to discontinue paying her all benefits was arbitrary and capricious.
Further, defendants failed to reasonably controvert the evidence establishing the surgery recommended by Tissa's treating physician is medically necessary. Dr. Fitter's contrary opinion is largely premised on assumptions and personal predilections. Again, "an insurer (or an employer) is required to make a reasonable effort to ascertain an employee's exact medical condition before benefits are terminated (or denied)." Johnson v. Ins. Co. of North America, 454 So.2d 1113, 1117 (La.1984); Duplechain v. Gulf States Utility Co., 468 So.2d 1386, 1390 (La.App. 3 Cir.1985). If defendants questioned the recommendation of Tissa's treating physician, they should have sought further evaluation as suggested by Dr. Watts, the physician they selected to render a second opinion. Their inaction "is the type of indifference toward an injured person which the statute *128 seeks to penalize." Lutz v. Jefferson Parish School Bd., 503 So.2d 106, 111 (La.App. 5 Cir.1987); Alexander v. Dept. of Culture, Recreation and Tourism, 410 So.2d 1286 (La.App. 3 Cir.1982).

DECREE
Accordingly, we reverse the Office of Workers' Compensation's judgment and render judgment in Tissa Wiltz's favor, against the defendants, awarding her temporary and total disability benefits from the date of the injury until a lawful basis for a change in her status occurs, together with statutory interest on the past due benefits until paid. Defendants are assessed statutory penalties in the amount of $2,000.00 or twelve (12%) of the unpaid benefits, whichever is greater. Rareshide v. Mobile Oil Corp., 97-1376 (La.App. 4 Cir. 4/22/98); 719 So.2d 494, writ denied, 98-1595 (La.10/9/98); 726 So.2d 28. We also assess statutory penalties against defendant in the amount of $2,000.00 for failing to authorize payment of Tissa Wiltz's surgery. See LeJeune v. Trend Services, Inc., 96-550 (La.App. 3 Cir. 6/4/97); 699 So.2d 95. Defendants shall promptly pay for the surgery recommended by Tissa Wiltz's treating physicians and any other medical costs related to the work injury. Plaintiff is awarded attorney's fees in the amount of $5,000.00 for the services provided at the hearing level and on appeal. La.R.S. 23:1201.2. Defendants are taxed with all costs below and on appeal.
REVERSED AND RENDERED.
NOTES
[1] It was discovered that the bone stimulator had malfunctioned. Tissa was unaware that the EBI had been placed in her back during surgery and the defect had not been detected prior to Tissa's FCE by Dr. Hodges.
[2] When asked how long the examination lasted, she responded "not even fifteen minutes."
[3] Tissa testified Dr. Fitter "didn't do anything to [her]" and "he didn't even touch [her]." Perhaps Tissa's testimony explains why Dr. Fitter was unable to detect any neurological signs of her recurrent disc herniation which was clearly evidenced on the MRI and EMG films.
[4] We note that La.R.S. 23:1221(1)(d) was amended by Acts 1999, No. 702, § 1, effective August 15, 1999, to delete the proviso: "or six months after the injury, whichever first occurs. If the claimant contends beyond this six-month period, he must submit a claim for extension of the period of temporary total disability under R.S. 23:1310.3."
[5] There is no evidence in the record that Tissa has experienced any suicidal ideation since the date of the work accident; and the judge's inclusion of "drug abuse" as being one of Tissa's health problems is simply not a fact proven by University Medical Center's records. To the contrary the records of that hospital show Tissa repeatedly denied any illegal drug use. All the tests conducted at the hospital to detect substance abuse by Tissa were negative, except for a trace finding of a marijuana derivative which was never confirmed by laboratory follow-up. The finding could have resulted simply from exposure to marijuana smoke or from the medication Tissa was prescribed. The single finding the defense and the judge rely on as support for their "character" attack, was not competent evidence and was not entitled to any probative weight.
[6] Tissa's work related injury occurred in 1994 and predated the 1995 amendment of this provision. The Supreme Court explained in Banks v. Industrial Roofing & Sheet Metal Works, Inc., 696 So.2d 551 (La.1997):

Under the former subsection (E) of LSA-RS 23:1201, a claimant is entitled to recover additional penalties from the employer for any compensation that is payable without an order, but which the employer failed to pay. The amount of the recoverable penalties is equal to twelve percent of the unpaid compensation or fifty dollars ($50.00) per day calendar day for each day that the compensation remained unpaid, whichever is greater, up to a maximum aggregate amount of two thousand dollars ($2,000.00). 1992 La. Acts No. 1003, § 1.