670 So.2d 406 (1996)
Norman CREEL, Plaintiff-Appellant,
v.
CONCORDIA ELECTRIC COOPERATIVE, INC., Defendant-Appellee.
No. 95-914.
Court of Appeal of Louisiana, Third Circuit.
January 31, 1996.
Writ Denied April 19, 1996.
*407 Jerry Lytel Lavespere Jr., Alexander, for Norman Creel.
James Edward Diaz Jr., Lafayette, for Concordia Electric Co-op, Inc.
Before DOUCET, C.J., and KNOLL and DECUIR, JJ.
DOUCET, Chief Judge.
The claimant, Norman Creel, appeals a judgment rendered by the hearing officer in this worker's compensation case.
The underlying facts were outlined in a earlier appeal of this matter:
Claimant was a utility company employee charged with the responsibility of repairing downed utility lines. On August 7, 1991, adverse weather conditions resulted in the loss of power to one or more residences.
Exactly what occurred at the scene of the accident is disputed. According to claimant, he first attempted to remove a blown fuse with a long telescopic rod. Unsuccessful in his initial efforts to change the fuse, he next climbed the pole and attempted to use a shorter telescopic rod, or "hot stick." According to defendant, claimant never tried to use the long rod, but only climbed the pole and used the *408 "hot stick" when the longer rod was available.
In any event, there is no question that claimant failed to use certain heavy safety gloves, which were designed at least in part to protect him from the perils he would encounter in handling the "hot stick." Nor does anyone question that claimant sustained injuries when he was shocked in the course and scope of his employment.
Creel v. Concordia Elec. Co-op., Inc., 93-1329, pp. 1-2 (La.App. 3 Cir. 5/4/94); 640 So.2d 507, writ denied, 94-1423 (La. 9/16/94), 642 So.2d 199.
After the initial trial of this matter, the claimant was denied benefits because of his failure to use gear designed for his protection. The claimant appealed the dismissal of his claim to this court. In Creel v. Concordia Elec. Co-op., Inc., 640 So.2d 507, this court found that the failure to wear safety gloves did not render the injury noncompensable. As a result the matter was remanded to the hearing officer for determination of Creel's claims for medical benefits, compensation benefits, penalties, and attorney fees.
After remand, another hearing was held at which additional evidence was adduced. The hearing officer rendered judgment denying Creel's claim for temporary total disability benefits. She made an award for disfigurement of 66 2/3% of claimant's wages for 100 weeks, but suspended the benefits during claimant's incarceration. Claimant appeals. The employer has answered the appeal.

TEMPORARY TOTAL DISABILITY BENEFITS
The claimant contends that, based on the evidence, the hearing officer erred in failing to award temporary total disability benefits. The hearing officers findings must be reviewed under the manifest error standard.
In a worker's compensation case, as in other cases, we are bound by the manifest error rule and we may not set aside the trial court's findings of fact unless they are clearly wrong or manifestly erroneous. Smith v. Louisiana Dept. of Corrections, 93-1305 (La. 2/28/94), 633 So.2d 129. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the factfinder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Smith, supra.; Rosell v. ESCO, 549 So.2d 840 (La.1989).
Kampen v. Conway Southwest Exp., 95-45, p. 12 (La.App. 5 Cir. 4/12/95), 655 So.2d 380, 385.
Creel claims physical and psychological disability. The record contains the testimony of a number of doctors with regard to Creel's condition. Creel was first taken to the emergency room of his local hospital. He was transferred, almost immediately, to the LSU Burn Center in Shreveport, Louisiana. There he was treated by Dr. Edwin A. Deitch and his partner, Dr. Kevin Sittig, both burn specialists. Dr. Deitch testified that Creel had burns on 14% of his body. 3 ½ to 4% of the body surface had sustained third degree burns. The remaining area sustained second degree burns. Creel remained in the burn unit for 16 days. The first 4 to 5 days of treatment consisted of local wound care and physiologic and metabolic support. The staff made sure there were no complications such as neurological deficits, heart problems or breathing problems. Creel's need for increased fluids and other materials was supplied. On the fourth or fifth day, they took Creel to surgery. They removed dead tissue on the areas of third degree burns over the anterior chest and laterally towards the shoulder and grafted skin onto the burn area. At the time of discharged, the skin grafts were 90-95% healed. 95 to 100% of the grafts had "taken." Dr. Deitch explained that areas of second degree burn do not require surgery. He further explained that areas which sustain third degree burn lose nerve tissue. As a result, those areas feel different from normal skin. Those areas further lose sweat glands so that they tolerate heat less well. The most common symptoms are itchiness and a burning or tingling sensation. However, he testified after a year most people have no further problems with the graft area. At the time of his deposition on March 3, 1993, Dr. Deitch examined Creel. He opined that it was a not fully mature skin *409 graft. He felt that it would get better in time with pressure therapy. He felt the graft area was still active. He stated that with pressure garments the skin grafts don't get as thick as Creel's and mature faster. He stated that Creel had been fitted with pressure garments but would not wear them because of discomfort. He stated that without pressure garments the skin grafts can thicken up and take several years to mature, up to five for some people. Dr. Deitch saw no significant contracture. He felt that Creel had good ability to move his neck to any functional level that one would ask. He stated that if Creel tried to strain and move his neck as far as it would go there would be tightness, but that this would happen to anyone who really tried to stretch their neck. Dr. Deitch stated that the area would loosen up still more with exercise. He stated that 90% of persons with burns in that area do not have psychological problems.
Dr. Sittig treated Creel after his release from the burn unit. He told Creel to wear pressure garments with the addition of foam padding over the scar. When he saw Creel on January 21, 1992, he noted that the chest scars were less hyperemic and were beginning to soften. A neck contracture band had formed. This contracture band was released with a z-plasty closure on March 25, 1992. On April 9, 1992, the incision had healed. Creel was complaining of tingling feelings in the burn area. Creel missed appointments of June 2 and 9 and July 13, 1992. Sittig had determined that he would release Creel to work if all was well in those visits. He notes that Creel was previously limited only by the contracture band and that even the band caused no functional restriction of motion. He saw Creel on July 28, 1992. He found the level of healing and freedom of motion expected. His notes indicate that Creel had not been wearing his pressure garments because they were uncomfortable. He felt the burns were maturing spontaneously. He recommended continuous scar massage and moisturizers. He felt that Creel had no further need for medication. However, he stated that it would benefit Creel to continue wearing the pressure garment with foam on top to put more pressure and speed the natural maturation process of the scarring. He felt that Creel probably was having discomfort when wearing the pressure garment. However, he stated that one of the reasons compression is used in treating burns is that the compression itself causes a desensitizing by continually triggering the pain stimulus until the patient becomes tolerant. Creel, however, was apparently unable to reach that point. He stated that Creel appeared to have a low tolerance of pain. He testified that he told Creel that he needed to go back to work and do something so that they could determine what he was able to do. Dr. Sittig explained that in any such situation there is a fear factor that one will not be able to do what he previously, and that one must go try to overcome this fear. Creel never told him he was afraid to go back to work. Therefore, Dr. Sittig did not recommend counseling or psychological treatment. While such problems are not unusual with burn victims, Dr. Sittig does not initiate discussions so as not to cause a problem that did not previously exist. He stated that Creel began complaining of pain when they discussed going back to work. He released Creel to light duty, but stated that Creel could have gone back to full duty if light duty was not available.
Dr. Riaz Chaudhry treated Creel from the end of August 1991 through May 1992. Dr. Chaudhry is a general practitioner. He stated that he may treat five major burns a year and ten to twenty minor burns. He first saw Creel on August 22, 1991, after his release from the burn unit. Creel was having pain. Dr. Chaudhry felt that the skin grafts were infected and pre-septic. Creel's white blood count was elevated. He admitted Creel to LaSalle General Hospital, where he was treated with IV antibiotics and IV fluids.
Conversely, Dr. Deitch states that upon release Creel's wounds were healing normally. He testified that the elevated blood count and pus in the wound area were not causes for alarm. He explained that those were signs of the body fighting infection and were part of the natural healing process. He opined that Creel need only to clean the area and change the dressing regularly.
Creel was released from the hospital on September 3, 1991. In follow up visits, Dr. *410 Chaudhry noted progressive healing. Dr. Chaudhry felt that the burns under Creel's arms might cause a limitation of motion. He saw a 30 to 40% improvement in range of motion in a year but stated that it might be 3 or 4 years before Creel recovers the full range of motion in his left arm. He did not feel that Creel could return to his previous work. He further advised that Creel work in a temperature controlled environment. Drs. Deitch and Sittig disagreed. Dr. Deitch opined that, in the absence of direct trauma, Creel can do anything. He believes that Creel can tolerate heat because of the limited area which incurred third degree burns. Dr. Sittig explained that, while 4% of Creel's body cannot perspire and is not heat tolerant, the remainder of his body will perspire to maintain a normal temperature. Dr. Chaudhry never released Creel to work. He did not see Creel after May 1992.
On May 13, 1992, Creel sought help from Dr. Ronald Pryer, a clinical psychologist. Dr. Pryer testified that on that visit Creel was in emotional and physical distress related to the accident. Creel had a constant preoccupation with his physical condition. Creel expressed fear of going back to work on the high lines or of being in the same situation again. Dr. Pryer reported that Creel's description of his burns was almost delusional. Creel told him that he had been in the LSU Burn Center for seven weeks although his stay lasted only two weeks. Dr. Pryer opined that this exaggeration could be caused by mental stress or confusion. He administered the Minnesota Multiphasic Personality Inventory. He felt that the results showed an extreme distress reaction. It did not, he opined, show that Creel was lying. Dr. Pryer reported to Dr. Chaudhry that Creel needed anti-depressant medication. He further recommended regular psychotherapy. Prozac and Desyrel were prescribed. Creel's condition improved over the next four to five visits then deteriorated. Creel was beginning to describe panic-like attacks. By July 1, 1992, Creel had apparently stopped taking his medication. Dr. Pryer stated that there was nothing to keep Creel from engaging in any sort of gainful employment unless he has organic brain involvement. He opined that Creel could go back to work without rehabilitation if he was over his depression and anxiety.
On February 6, 1993, Dr. Paul D. Ware specializes in psychiatry, neurology and neuropsychology. He did a psychiatric evaluation of Creel. In conjunction with the evaluation, a social worker obtained a social history from Creel's wife and his mother. On examination, Creel denied being depressed. Creel told Dr. Ware that he had been depressed and that Dr. Pryer had diagnosed a major depressive disorder. He said he had been off anti-depressant medication for several months. Creel further denied sleep disorder, crying spells, tiredness and other symptoms of depression. He showed no evidence of memory impairment. He gave a history of injuries which was inconsistent with that given by his wife and mother. They reported multiple injuries, including another severe electrical burn or shock. Creel did not disclose this. He reported past problems with drinking but stated that he had stopped excessive drinking. Dr. Ware found no evidence of organic brain dysfunction. His preliminary impression was that Creel was suffering from an adjustment disorder of adulthood with anxiety and mild depression. Dr. Ware did not feel that the problem was disabling in terms of being able to work or to take care of his wife, who was more disabled than Creel. Additionally, in connection with Dr. Ware's evaluation, a clinical psychologist ran a battery of psychological tests on Creel. The tests' results indicated a low average IQ. Further an achievement test indicated that he was not putting out much effort and was performing well below ability. Other tests indicated conscious exaggeration of results. The clinical psychologist also felt that the test results indicated an adjustment disorder of adulthood with mixed emotional features. She stated that additional evidence was needed to rule out alcoholism. Dr. Ware felt that Creel wanted to hold onto his illness as much as he could. He noted a tendency to somatize, or express his mental condition as a disturbed bodily function. He saw no clear reason for continued treatment or medication. He said that there *411 was no psychiatric reason Creel could not return to his prior work. He further stated there was no reason to believe that Creel would be a danger to others on the job.
On August 4, 1994, Creel went to the Alexandria Mental Health Clinic seeking treatment for depression. He was treated by Dr. Roa Puvvada, a psychiatrist. Creel gave a history of burns and medical problem. He told Dr. Puvvada that his accident had occurred only a year before, rather than the actual three years before. He reported a long history of drinking problems with hospitalizations. Dr. Puvvada's impression was post-traumatic stress disorder. He felt that further information was needed to rule out a major depression and alcohol dependency. He did not assess Creel's ability to work as an electrical lineman. Creel wanted to get back on Prozac. Dr. Puvvada stated that Prozac does not affect the ability to work. On September 9, 1994, Creel was in jail. Dr. Puvvada had him admitted from jail to the Mental Health Unit of Huey P. Long Hospital because of fears that Creel would harm himself.
At the hospital, Creel was treated by Dr. John M. Smith, a psychiatrist. Dr. Smith testified that Creel had a history of difficulties with drinking heavily and becoming hostile which pre-dated the accident. The drinking problem was the focus of Dr. Smith's treatment. A physical exam upon admission revealed a normal range of motion. A neurological exam showed that Creel's reflexes and strength were normal. Creel told Dr. Smith that he had been living at Concordia Parish Detox doing maintenance work for them. Dr. Smith felt that Creel should go back there since he was getting the emotional support and AA meeting he needed there. Dr. Smith testified that he did not try to figure out why Creel was not working as an electrician because he knew that Creel could do some useful work and had a place to go. The physical exam indicated that Creel was recovered enough to go to work. Dr. Smith did not investigate whether Creel was emotionally able to work since he knew that Creel had been doing general maintenance work. Dr. Smith opined that the accident was not Creel's main problem at the time of admission. Dr. Smith stated that he was not able to say that Creel was drinking because of the accident. He opined that, in light of his history, Creel would have been drinking regardless. He noted Creel's history of heavy drinking leading to seizures and Creel's tendency to blame others for his problems. Creel was seen one more time by Dr. Puvvada on October 12, 1994. At that time, he stated that the hospital had helped him.
The hearing officer, in written reasons for judgment, indicated that she did not give great weight to Dr. Chaudhry's testimony because he does not practice burn medicine as an specialty and had not had the opportunity to examine the claimant on an ongoing and repetitive basis as had Dr. Sittig. After reviewing the medical testimony as to Creel's physical condition she stated:
In summary, the medical evidence is simply overwhelming that claimant presently has no disability from working as the result of the August, 1991 accident, that the 4% of his body which suffered third degree burns was appropriately grafted, no contracture bands exist as to limit any functional range of motion and no significant discomfort is expected or likely from this very limited and completely healed burn.
The prerequisite for weekly indemnity benefits is an inability to earn wages as the result of a disability secondary to a work-related accident. Where there is complete functional healing, and no restriction to work at any occupation, weekly indemnity benefits should not be paid. Therefore, for the reasons stated hereinabove, claimant's request for temporary total disability benefits is denied.
The hearing officer then reviewed the testimony as to Creel's psychological condition and concluded that:
The burden of proof which the plaintiff must carry in order to establish a psychological disability according to La.R.S. 23:1021(7)(c) is that of clear and convincing evidence of such psychological disability. None of the treating physicians of claimants found any basis for referring him for psychological help. The only referral *412 came from his attorney. Defendant's choice of psychiatrist, together with the State psychiatrists, all agree that claimant has no disability from working. They found that the primary problem possessed by claimant is one of alcohol dependence which pre-existed the accident. They strongly indicate that claimant has no psychological disability which resulted from the accident, but instead is no worse or better off that he was prior to the accident.
Dr. Smith indicated that any finding of depression at the present time could well be explained by the multiple problems which claimant has had recently in his life, including his severe interpersonal problems with his second wife, his repeated DWI charges, his present incarceration as of November 1994 resulting from a violation of probation and an imposition of a multi-year criminal sentence. While the August 1991 accident and the consequent injury can certainly be considered a stress factor in his present depression and problems with alcohol dependence. Such facts clearly do not carry the plaintiff's burden of proof by clear and convincing evidence, and instead very amply demonstrate that this claim of psychological disability should be denied. Therefore, for the reasons stated hereinabove, claimant's request for weekly workers' compensation benefits for a psychological disability is hereby denied.
Although the testimony was in conflict, our review of the record convinces us that the trier of fact's evaluations of credibility and inferences of fact were reasonable. Finding no manifest error, we affirm the hearing officer's conclusion that Creel was not entitled to temporary total disability benefits.

DISFIGUREMENT
In their answer to the appeal, the defendants argue that the claimant is not entitled to an award for disfigurement because of the location of the burn.
La.R.S. 23:1221(4)(p) provides in pertinent part for the payment of benefits to persons suffering permanent disfigurement:
In cases not falling within any of the provisions already made, where the employee is seriously and permanently disfigured... compensation not to exceed sixty-six and two-thirds percent of wages for a period not to exceed one hundred weeks may be awarded. In cases where compensation is so awarded, when the disability is susceptible to percentage determination, compensation shall be established in the proportions set forth in Subparagraph (o) of this Paragraph. In cases where compensation is so awarded, when the disability is not susceptible to percentage determination, compensation as is reasonable shall be established in proportion to the compensation hereinabove specifically provided in the cases of specific disability.
This court in Broadway v. Cade Wood, Inc., 583 So.2d 153, 154-155 (La.App. 3 Cir. 1991) defined disfigurement:
La.R.S. 23:1221(4)(p) specifically provides that compensation is allowed only for serious and permanent disfigurement. The Louisiana worker's compensation act does not define the term "disfigurement" nor has our research of Louisiana jurisprudence revealed any case defining the term "disfigurement". The term "disfigurement" has been defined in other jurisdictions as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner". Superior Mining Co. v. Industrial Commission, 309 Ill. 339, 141 N.E. 165 (Ill.1923). A serious disfigurement is a disfigurement "of such a character that it substantially detracts from the appearance of the person disfigured". Dombrowski v. Fafnir Bearing Co., 148 Conn. 87, 167 A.2d 458 (Conn.Sup.Ct.Err. 1961).
The determination of whether an injury is disfiguring is factual. Therefore, the hearing officer's finding on this point will not be disturbed absent manifest error. The hearing officer in this case found that Creel's scars were a serious and permanent disfigurement, based on the record and on an examination of the scar. The record is clear that the burn area will never have a normal appearance. The photographs show that an ugly scar covers claimant's chest into the neck area. Any open neck shirt will reveal *413 the scar. Under the circumstances, we find no error in the hearing officer's conclusion that Creel is entitled to benefits for disfigurement.

SUSPENSION OF DISFIGUREMENT BENEFITS
Creel argues that La.R.S. 23:1201.4 does not support the suspension of the award for disfigurement during his period of incarceration because he has dependents who rely on the compensation award for their support. La.R.S. 23:1201.4 states that if an incarcerated claimant has dependents who rely on the benefits for their support the "compensation shall be made payable and transmitted to the legal guardian of the minor dependent or other person designated by the hearing officer and such payments shall be considered as having been made to the employee."
The record does, in fact, support Creel's allegation that he has dependents. Therefore, the award of benefits for disfigurement should not have been suspended. However, we are unable to determine from the record the identities of the dependents or the name of their legal guardian, if any. Therefore, this matter will be remanded to the hearing officer for a determination of the identities of the dependents, and the name of their legal guardian, so that payment of the benefits may be made to them.

QUANTUM OF DISFIGUREMENT AWARD
The claimant, in his appeal brief assigns as error "The Courts' allowing a credit against desfigurement (sic) benefits awarded ..." This assignment refers to an amended judgment handed down by the hearing officer on June 20, 1995, almost two months after the appeal in this matter was granted on April 27, 1995. Although the validity of this amended judgment is questionable, the defendants, in their answer to the appeal, have raised the issue of their entitlement to a credit for benefits paid. The parties stipulated, at the second hearing on this matter, that the defendants paid the claimant compensation benefits in the amount of $11,328.42.
La.R.S. 23:1223(A) provides that "[w]hen compensation has been paid under R.S. 23:1221(1), (2), or (3), the amount of such payment shall be deducted from any compensation allowed under R.S. 23:1221(4) or Subpart C of this Part." La.R.S. 23:1221(1), (2), and (3) concern the payment of temporary total, permanent total and supplemental earnings benefits respectively. Accordingly, the payment of benefits by the defendants entitles them to a credit against the disfigurement owed claimant under La.R.S. 23:1221(4). The judgment of the hearing officer will be amended to reflect this credit.

REHABILITATION
The major part of claimant's argument on appeal concerns his entitlement to rehabilitation. La.R.S. 23:1226(A) states that "[w]hen an employee has suffered an injury covered by this Chapter which precludes the employee from earning wages equal to wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services." However, there is evidence in this case which, subject to a reasonable credibility evaluation, supports the conclusion that the injury did not prevent the claimant from returning to the same work. The testimony of Dr. Sittig and Deitch indicates that the claimant is physically able to return to any work. The testimony of Drs. Smith and Ware indicates that Creel's psychological problems stem from factors other than his injury. As a result, we cannot say that the hearing officer erred manifestly in denying rehabilitation.

PENALTIES AND ATTORNEYS FEES
Finally, the claimant asserts that the trial judge erred in failing to award penalties and attorney's fees. Creel contends that the defendant's were arbitrary and capricious in that they cut of his benefits based on the release signed by Dr. Sittig on June 9, 1992. He argues that since Dr. Sittig's testimony indicates that he intended to release Creel only to light duty, the defendant's were arbitrary in failing to offer him light duty and in terminating his benefits. However, the release signed by Dr. Sittig does not indicate that it is a release to light duty. It states that he could return to full-time work that date without limitations. *414 "Whether or not a termination of benefits is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Brown v. Manville Forest Products Corp., 565 So.2d 496 (La.App.2d Cir.), writ denied, 567 So.2d 1127 (La.1990)." Miles v. F.D. Shay Contractor, Inc., 626 So.2d 74, 78 (La.App. 3 Cir.1993). There is nothing of record to indicate that the defendants were aware of any limitations on Creels ability to work. In fact, Dr. Sittig testified that if light duty was not available, Creel was able to return to full duty at the time of his release. Accordingly, based on the information before them, the defendants were not arbitrary, capricious or unreasonable in terminating the claimant's benefits upon his release to work on June 9, 1992.

CONCLUSION
Accordingly, the judgment of the hearing officer is reversed with regard to the suspension of the benefits for disfigurement during the period of Creel's incarceration. This case is remanded for a determination of the identities of the dependents, and the name of their legal guardian, so that payment of the benefits may be made to them. The judgment is amended to reflect that the defendants are granted a credit for past benefits paid in the amount of $11,328.42 against the disfigurement benefit due. In all other respects the judgment of the hearing officer is affirmed. REVERSED AND REMANDED IN PART; AMENDED IN PART AND AFFIRMED IN PART.