788 So.2d 34 (2000)
James LYONS
v.
BECHTEL CORPORATION and AIU North American, Inc.
No. 00-00364.
Court of Appeal of Louisiana, Third Circuit.
December 27, 2000.
Writ Denied March 23, 2001.
*36 Kevin A. Marks, Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, LA, Counsel for Plaintiff-Appellant.
Kevin L. Camel, Cox, Cox, & Filo, Lake Charles, LA, Counsel for Defendants-Appellants.
Court composed of Chief Judge DOUCET, YELVERTON, and SAUNDERS, Judges.
SAUNDERS, Judge.
The Appellant, James Lyons, brought suit against his employer, Bechtel, and its insurer, AIU North American, Inc. (AIU), on October 27, 1998, seeking disability payments, reimbursement of medical expenses, penalties, and attorney fees. After trial on the merits, the workers' compensation *37 judge (WCJ) concluded that Mr. Lyons had proven that he was in a work accident, but had not met his burden of proof in establishing that his injuries were caused by that work accident. Mr. Lyons' demands were therefore denied.
On appeal, this court holds that the WCJ erred in finding that Mr. Lyons did not prove his injuries were work-related by a preponderance of the evidence. This court further holds that the WCJ did not err in failing to award penalties and attorney fees against Bechtel and AIU, the Appellees, for their refusal to provide medical treatment to Appellant following his September 1998 accident. Finally, the court holds that the WCJ did not err in failing to award penalties and attorney fees against the Appellees for the termination of the Appellant's weekly indemnity benefits.

FACTS
Mr. Lyons began working for Bechtel Corporation on August 27, 1998. Bechtel hired Mr. Lyons to operate a 98 Linkbelt clam bucket at its work site in Merida, Mexico. The operations in Merida involved the laying of approximately 500 miles of pipeline. For his labor, Mr. Lyons testified that he was to be paid $8,100 a month. This amount included a $2,400 per month allowance for living expenses while in Mexico.
Upon arriving in Merida, Mexico, Bechtel assigned Mr. Lyons to operate a hydraulic backhoe rather than a 98 Linkbelt. Mr. Lyons' main task was to keep the ditch where the pipe was to be laid free of debris, rocks, and water. On September 23, 1998, Mr. Lyons decided to ride the bus, used to transport the Mexican workers on the site, to the crew working behind him. Mr. Lyons testified that he intended to aid the other crew in covering the ditch for the night. When the bus stopped to pick up the Mexican workers, Mr. Lyons testified that he honked his horn and told the workers to wait for him. Mr. Lyons testified that he grabbed his lunch bucket, and he proceeded to jump the ditch. Unfortunately, Mr. Lyons lost his footing and fell into the ditch. Mr. Lyons testified that he hit the wall of the ditch and slid down it. He also testified that he stuck out his hand to break his fall causing his wrist to jam, and he struck his elbow and his neck on the bank of the wall. After his fall, his Mexican helper, Amando, and several other Mexican workers pulled him out of the ditch. Mr. Lyons then boarded the bus. Upon arriving at the worksite, Mr. Lyons testified that he told his foreman, Brian Brecky, about the accident. Mr. Lyons told Mr. Brecky that he had fallen in the ditch and had shown him the scratches and bruises. Mr. Lyons testified that nothing was done by Mr. Brecky at that time and that he had not asked for medical treatment. Mr. Lyons also testified, in his deposition, that he had shown both Mr. Brecky and Randy Terry, the foreman of the crew that lowered pipe behind Mr. Lyon's crew, his injuries on his buttocks, lower back and wrist, sometime after the fall. To show Mr. Brecky and Mr. Terry the bruises on his buttocks, Mr. Lyons testified that he had pulled his pants down, and they had responded by saying that they did not want to see this part of his anatomy.
Thereafter, Mr. Lyons continued to work. Mr. Lyons' accident occurred on a Tuesday, and he testified that he worked until Saturday of that week. During that time, Mr. Lyons testified that he was unable to perform all of the tasks he normally performed. He testified that he told Mr. Brecky that he did not think he was capable of running the equipment, but that he would try. Mr. Lyons testified that in response, Mr. Brecky told him that *38 he could let Amando, who was in training, operate the equipment. Since Amando was not present that morning, Mr. Lyons operated the machine. Mr. Lyons testified that despite the fact he continued to operate the equipment after the accident, he experienced discomfort from sitting in the seat for a long period of time because of the manner in which the machine jarred him. Mr. Lyons stated that he could not be on the machine longer than three or four hours without having to get up and walk. Mr. Lyons testified while he operated the machine, his lower back and neck hurt. During the period between Tuesday, September 23, 1998, and Saturday, September 27, 1998, none of Bechtel's supervisors offered to take him to the doctor or to provide any medical treatment.
On Saturday, Mr. Lyons testified that on the way back to the motel in Piste, Mexico, Mr. Brecky told him that Mr. Terry was trying to "get [him] run off." After Mr. Terry cleaned up in his motel room, he went to the restaurant area where Mr. Terry and Mr. Brecky were sitting. Mr. Lyons joined them and began discussing work. During the course of that conversation, Mr. Lyons testified that he ordered dinner and a drink. Mr. Lyons testified that they were discussing Bechtel's decision to allow Mr. Lyons to use a 98 Linkbelt instead of the hydraulic backhoe he had been using because he had been experiencing problems with his hydraulic lines.
At some point after Mr. Terry announced that Mr. Lyons would be given a 98 Linkbelt, a dispute arose between he and Mr. Lyons. Mr. Lyons testified he told Mr. Terry that he "didn't want no help from anybody that was trying to get [him] run off...." (When Bechtel hired Mr. Lyons, L.D. Pickens, a supervisor, had told him that if he needed any help, he should ask Mr. Terry to give him pointers.) Then, Mr. Terry walked out of the restaurant into a grassy area and yelled at Mr. Lyons demanding that he follow him outside. Mr. Lyons went outside, and he and Mr. Terry began fighting. Mr. Lyons testified that he could not remember all of the fight. He testified that he assumed Mr. Terry had grabbed him by the head and hit him there because he had knots on his head and his ear and his eye was black and cut. After the fight, Mr. Lyons testified that he walked to his motel room and called L.D. Pickens, the main supervisor. Mr. Lyons testified that during that conversation, he told Mr. Pickens about the fight. The next morning, Mr. Lyons testified that Mr. Brecky picked him up at the hotel to bring him to work. Mr. Lyons then testified that he told Mr. Brecky he needed a ride to the main office so that he could return to the United States. Danny Burgess, the foreman who supervised Mr. Brecky and Mr. Terry, gave Mr. Lyons a ride to the main office and scheduled a flight to the United States for him. Mr. Lyons returned to the United States on September 30, 1998.
Shortly after his return home, Mr. Lyons testified that he went to his family doctor, Dr. Carl Nabours. Dr. Nabours examined him, performed x-rays, and referred Mr. Lyons to an orthopedic surgeon, Dr. Lynn Foret.
Dr. Foret examined Mr. Lyons on October 20, 1998. Dr. Foret noted Mr. Lyon's left wrist pain, low back pain, neck pain, and numbness in the arms. Dr. Foret scheduled MRI's of the cervical and lumbar spine, and scheduled a follow-up visit. He also restricted Mr. Lyons from returning to work.
During their next visit, on November 4, 1998, Dr. Foret reviewed the MRI films with Mr. Lyons. The MRI films of the cervical spine revealed a "mixed right paracentral C5-6 disc protrusion with mild *39 right ventral cord compression." The MRI films also revealed "a small central disc herniation of the protrusion-type at C6-7 with minimal ventral midline cord compression." Dr. Foret noted that there was "a small right paracentral and right proximal foraminal disc protrusion at 4-5 without neural compression." Dr. Foret also recognized that Mr. Lyons had "some foraminal stenosis at 5-6 as well as that mixed disc protrusion at that level 5-6." Finally, the MRI films of the lumbar spine indicated "a tiny central non-compressive disc herniation of the protrusion-type at L5-S1." After this visit, Dr. Foret referred Mr. Lyons to a neurosurgeon, Dr. William Foster, for evaluation of his cervical disc injuries.
Dr. Foster's initial visit with Mr. Lyons was on November 11, 1998. At that time, the doctor noted significant disc herniations in the last two cervical disc levels. Dr. Foster recommended a myelogram and CAT scan, which were performed on February 8, 1999. These diagnostic studies indicated that Mr. Lyons had "a[n] extradural defect in the neck at C5/6." Dr. Foster also noted that Mr. Lyons had a "slippage of a moderate amount, no more than one to two millimeters at C3 on C4." Dr. Foster further indicated that Mr. Lyons' CAT scan showed that he had "a focal disk protrusion at C4/5, paracentral and to the right."
Dr. Foster saw Mr. Lyons on February 16, 1999. During that visit, Dr. Foster explained the results of the studies to him. Dr. Foster's impression was that Mr. Lyons had a herniated cervical disk and evidence of nerve root irritation or compression on the right side and an element of spinal cord compression. In addition, Dr. Foster felt that he had a lumbar strain with nerve root irritation.
Dr. Foster's last examination of Mr. Lyons was on May 4, 1999. During that visit, they discussed the second opinion the insurance company's choice of physician, Dr. Juneau, had given. Dr. Juneau had indicated that he felt surgery would be an option for Mr. Lyons' neck injury. Dr. Foster discussed the possibility of surgery with Mr. Lyons, and the alternatives to having surgery performed. Dr. Foster testified that he recommended doing an anterior cervical diskectomy and fusion at two levels, C-4/5 and C-5/6.
Bechtel had Mr. Lyons examined by Dr. Patrick Juneau, who agreed with Dr. Foster's diagnosis. Dr. Juneau agreed that an anterior cervical diskectomy and fusion at the C-4/5 and C-5/6 levels was appropriate under the circumstances. Dr. Juneau also stated that Mr. Lyons probably could not return to his employment as a heavy equipment operator even after the surgery. Dr. Juneau indicated that he anticipated that Mr. Lyons probably could perform light duty and might be able to perform medium duty after surgery.
On May 26, 1999, the Appellees discontinued Mr. Lyons' disability benefits and the payment of his medical expenses. The Appellees based their decision to terminate Mr. Lyons benefits on his deposition testimony taken May 21, 1999.

PROCEDURAL FACTS
The Appellant filed a disputed claim on October 27, 1998, seeking disability payments, reimbursement of medical expenses, penalties, and attorney fees. The Appellees answered the suit admitting that the correct compensation rate was $367 per week.
Trial on the matter took place on July 14, 1999. The Appellant and his fiancee', Theresa Lankowski, testified at trial on the Appellant's behalf. Chris Lodriguss, the surveillance operative for the Appellees, testified on the Appellees' behalf. *40 The parties submitted all expert medical testimony by deposition.
On September 10, 1999, the WCJ rendered and signed a written judgment in favor of the Appellees and against the Appellant. In that judgment, the WCJ also denied the Appellees' request for forfeiture of benefits under La.R.S. 23:1208.
In her reasons for judgment, the WCJ found that the Appellant's fall into the ditch was a work accident under workers' compensation. She based this finding on the fact that Mr. Lyon's testimony regarding his fall into the ditch was consistent and plausible and that his version of the accident had been uncontradicted by any witness.
The WCJ determined, however, that Mr. Lyons did not prove by a preponderance of the evidence that the work-related accident caused his injuries. The WCJ noted that Mr. Lyons worked for several days after the accident and then was involved in a fight. Of particular concern to the WCJ was the fact that Mr. Lyons did not tell any of the doctors about the fight after the work accident. Because of this, the WCJ felt that Mr. Lyons had failed to meet his burden of proof in showing that the disability arose from the work accident when an intervening cause, the fight, could have caused the disability.

LAW AND ANALYSIS

STANDARD OF REVIEW
Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305 (La.2/28/94); 633 So.2d 129. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Id. Accordingly, if the WCJ's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).

ASSIGNMENTS OF ERROR
On appeal, Appellant alleges three assignments of error. These assignments of error are as follows:
1. The WCJ erred in finding that the Appellant failed to meet his burden of proof that his injuries were work-related.
2. The WCJ erred in failing to award penalties and attorney fees for the employer/insurer's refusal to provide medical treatment to the Appellant following his September 1998 accident.
3. The WCJ erred in failing to award penalties and attorney fees for the employer/insurer's termination of all benefits on May 26, 1999.

BURDEN OF PROOF
In Appellant's first assignment of error, he asserts that the WCJ erred in finding that he failed to meet his burden of proof that his injuries were work-related. An employee seeking workers' compensation benefits must make a threshold showing that he sustained personal injury through an accident arising out of and in the course of his employment. La.R.S. 23:1031. The employee must prove that he was involved in a work-related accident by a preponderance of the evidence. See Bruno v. Harbert Int'l. Inc., 593 So.2d 357 *41 (La.1992); Nelson v. Roadway Express, Inc., 588 So.2d 350 (La.1991). An accident is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury...." La.R.S. 23:1021(1). The test for proving an unwitnessed accident is as follows:
A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident.
Bruno, 593 So.2d 357, 361. Medical evidence, the testimony of other workers, spouses, or friends may provide corroboration of the worker's testimony. Id.
In her reasons for judgment, the WCJ found that the Appellant's fall into the ditch was a work-related accident under workers' compensation. The WCJ determined, however, that Mr. Lyons did not prove by a preponderance of the evidence that the work-related accident caused the disability to his neck. The WCJ felt the disability could have resulted from the fight, which she assumed would be a non-work-related, intervening cause of injury. A WCJ's findings of fact are subject to the manifest error standard of review. Id. Accordingly, we may not reverse the findings of the WCJ unless we find that she was manifestly erroneous in her determination that the Appellant did not meet his burden of proof in showing that his injury was work-related.
In the instant case, the Appellant did not include the fight with his supervisor, Mr. Terry, in his petition for workers' compensation. However, during trial on the merits, testimony about the fight between the Appellant and Mr. Terry entered the record without objection. Under La.Civ. Code.P art. 1154:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues.
(Emphasis added.) Therefore, even though the Appellant did not plead that the fight was work-related in his petition for compensation, we may consider it on appeal as evidence of the fight was introduced at trial without objection. In such an instance, we may treat the issue as if it had been raised in the pleadings.
In the instant case, the WCJ erred in finding that the Appellant had not proven that his injury was work-related by a preponderance of the evidence. The WCJ's determination that the Appellant's injury may have not been work-related hinged on her belief that the fight may have been an intervening cause of the Appellant's injuries. The WCJ failed to consider, however, whether the fight could be considered work-related and therefore covered under workers' compensation.
Under La.R.S. 23:1031(A), an employee must show that he sustained personal injury through an accident arising out of and in the course of his employment. In determining whether an accident arises out of employment, a WCJ must focus on the character or source of the risk which gives rise to the injury and on the relationship of the risk to the nature of the employment. See Pappas v. Marine Spill Response Corp., 94-879 (La.App. 3 Cir. *42 2/15/95); 650 So.2d 441, writ denied, 95-0706 (La.5/5/95); 654 So.2d 326; Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917). An accident arises out of employment if an employee's injury resulted from a risk that was greater for the employee than for a person not engaged in the employment or, if the conditions or obligations of the employment caused the employee, in the course of employment, to be at the place of the accident at the time the accident occurred. Pappas, 94-879; 650 So.2d 441.
The course of employment refers to time and place, while the scope of employment refers to the work-related risk of injury. Benoit v. Capitol Mfg. Co., 617 So.2d 477 (La.1993). LeBrane v. Lewis, 292 So.2d 216 (La.1974) sets forth the test for determining whether an accident occurred within the course of employment. Under LeBrane, an employer is responsible for an employee's intentional tort when his conduct is so closely connected in time, place, and causation to his employment duties that it constitutes a risk of harm attributable to the employer's business. Id. Although LeBrane, deals with intentional torts, our jurisprudence has found that the "course and scope" requirements for employers seeking to avail themselves of tort immunity under La.R.S. 23:1032 are largely the same as those for employees seeking workers' compensation benefits under La.R.S. 23:1031. See Pappas, 94-879; 650 So.2d 441. Therefore, our jurisprudence relating to one type of controversy is applicable in dealing with the other. Id.
In LeBrane, 292 So.2d 216, Lewis, a kitchen steward, was the immediate supervisor of LeBrane, a kitchen helper. The day of the LeBrane's injury, he arrived late for work. Id. Lewis told LeBrane to take the rest of the day off to get a hair cut because the hotel manager did not like "bushy-haired" employees to be on the food premises. Id. at 217. LeBrane refused to leave work, so Lewis terminated his employment. Id. Lewis attempted to bring LeBrane to the hotel manager's office via the elevator so that he could receive his final paycheck. Id. As the manager was not in, they re-entered the elevator. Id. At some point thereafter, Lewis and LeBrane began fighting, and Lewis stabbed LeBrane. Id. The final stabbing took place in the basement level of the hotel, away from the kitchen. Id.
In analyzing this case to determine whether the employer would be liable for Lewis' actions in stabbing LeBrane, the court determined that the dispute between the two was primarily employment-rooted. Id. The court found that the fight was reasonably incidental to the performance of Lewis' duties as supervisor in firing LeBrane and causing him to leave the hotel. Id. The court also noted that the fight took place on the employment premises and occurred during the hours of employment. The court concluded that because Lewis' conduct was closely connected in time, place, and causation to his employment-duties, his conduct was to be regarded as a risk fairly attributable to the employer's business. Id. Therefore, the court found that Lewis' actions were within the scope of his employment such that his employer was liable in tort to LeBrane. Id.
In addition this circuit dealt with defining the course and scope of employment in Pappas, 94-879; 650 So.2d 441. In that case, two employees of Marine Spill Response Corporation, who were attending a convention in New Orleans, met business prospects who stated that they would be visiting Bourbon Street that evening. After the convention was over, the employees went to the Cat's Meow, a karaoke bar on *43 Bourbon Street. Id. During the course of the night, Mr. Pappas, one of the employees, knocked over a beer bottle belonging to one of the bar's patrons. Id. The patron then kicked Pappas in the groin causing him injury and resulting in necessary medical expenses of $1,600. Id.
This court found that Mr. Pappas' injury producing accident occurred in the course and scope of his employment. Id. In doing so, the court noted that the WCJ properly placed emphasis on whether the employer had required the worker to be present at the time and place the accident occurred in determining that Mr. Pappa's injury was work-related. Id. The court reasoned that the evidence produced at trial showed that Mr. Pappas and the other employee had traveled to Bourbon Street to interface with the other vendors who had attended the conference. Id. The court noted that their goal in going to Bourbon Street and attending the convention was to develop a relationship with other individuals in the communications business. Id. Finally, the court recognized that Mr. Pappas would not have been in New Orleans except that his employer required his attendance at the conference there. Id.
In the instant case, as in the aforementioned cases, the injuries caused by Mr. Terry to the Appellant during the fight were work-related and therefore compensable under La.R.S. 23:1031. Although an employer may escape liability for an employee's injuries arising out of a dispute with another employee over matters unrelated to employment, the fight between the Appellant and Mr. Terry arose out of their employment with Bechtel. See La.R.S. 23:1031(E). As in LeBrane, the fight between the Appellant and Mr. Terry arose out of a discussion regarding the Appellant's work, in this case Appellant's performance on the hydraulic backhoe.
In addition, the fight between the Appellant and Mr. Terry clearly took place within the course of their employment. The fight took place at a time and in a place where Bechtel dictated that the parties must be as part of their employment. See Pappas, 94-879; 650 So.2d 441. The Appellant and Mr. Terry had to remain in Mexico for the duration of their employment with Bechtel. Bechtel paid for its employees to stay at the motel in Piste, Mexico where the parties engaged in their fight. An employee may be within the course of his employment even if the accident does not occur between the hours of nine and five or at the employee's usual workstation. Id.
Therefore, we find that the injuries sustained by the Appellant, which were attributable to the fight, arose out of and occurred within the course and scope of his employment. In addition, we agree with the WCJ, that the Appellant's fall into the ditch on September 23, 1998, was a work-related accident. The fight at issue is not an intervening cause of injury, but an additional work-related cause of injury. Accordingly, we find that the WCJ erred in finding the Appellant did not meet his burden of proving that his injuries were work-related.

REFUSAL TO PROVIDE MEDICAL TREATMENT
In his second assignment of error, the Appellant asserts that the WCJ erred in failing to award penalties and attorney fees for the employer/insurer's refusal to provide medical treatment following the September 1998 accident. Appellant argues that the Appellees did not provide prompt medical treatment and did not attempt to explain their failure to provide such treatment until after the Appellant filed a disputed claim with the Office of Workers' Compensation. The determination *44 of whether an employer/insurer should be cast with penalties and attorney fees in a workers' compensation proceeding is a question of fact, and a WCJ's findings shall not be disturbed on appeal absent manifest error. See Wiltz v. Baudin's Sausage Kitchen, 99-930 (La.App. 3 Cir. 6/19/00); 763 So.2d 111, writ denied, 00-2172 (La.10/13/00); 771 So.2d 650.
Penalties and attorney fees for the nonpayment of medical benefits are provided for under La.R.S. 23:1201. The applicable portion of La.R.S. 23:1201 provides:
E. Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof.
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Under La.R.S. 23:1201, sanctions, in the form of penalties and attorney fees, are available when workers' compensation benefits are not provided as required by law. See Clifton v. Rapides Reg'l Med. Ctr., 96-509 (La.App. 3 Cir. 10/9/96); 689 So.2d 471. The test for determining whether an employer or insurer has fulfilled its duty to furnish medical benefits is whether the employer or insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the workers' compensation claimant. Gibson v. Dynamic Indus., Inc., 96-1605 (La.App. 3 Cir. 4/2/97); 692 So.2d 1320; Faul v. Bonin, 95-1236 (La. App. 3 Cir. 8/7/96); 678 So.2d 627, writ denied, 96-2221 (La.11/15/96); 682 So.2d 769.
Thus, we must consider whether the Appellees had factual and medical information sufficient to reasonably counter that presented by the Appellant when they refused to provide him with medical treatment. Upon a review of the record, we agree with the WCJ that no award of penalties and attorney fees should be made in this instance.
The record shows that the Appellant sought workers' compensation and medical benefits because of his fall into the ditch on September 23, 1998. The Appellant did not claim that the fight between himself and Mr. Terry was work-related. In fact, his testimony during his deposition and at trial indicated that he felt the fight was not work-related, that it was a fight "between men." Additionally, we note that the fight between the Appellant and Mr. Terry took place away from the work site and after normal work hours. Although we find the evidence supporting the work-relatedness of the fight to be *45 stronger, we feel that based on the evidence present in the record, the Appellees were justified in making a good faith argument that the Appellant's injuries were not work-related. Accordingly, we find that the Appellees reasonably countered the Appellant's claim that medical benefits were due based on the information they held at the time of the alleged denial. Therefore, we find that the WCJ did not err in failing to award penalties and attorney fees for the Appellant and against the Appellees based on the alleged denial of medical treatment.

TERMINATION OF BENEFITS
In his final assignment of error, the Appellant asserts that the WCJ erred in failing to award penalties and attorney fees for the employer/insurer's termination of his weekly workers' compensation indemnity benefits. The Appellees argue in response that they terminated his benefits on May 26, 1999, only after the Appellant lied repeatedly during his deposition. The determination of whether an employer/insurer should be cast with penalties and attorney fees in a workers' compensation proceeding is a question of fact, and a WCJ's findings shall not be disturbed on appeal absent manifest error. See Wiltz, 99-930; 763 So.2d 111.
Since the Appellees did initially provide Appellant with weekly indemnity benefits, the applicable statute is La. R.S. 23:1201.2. See Brown v. Texas-La Cartage, Inc., 98-1063 (La.12/1/98); 721 So.2d 885. The pertinent part of La.R.S. 23:1201.2 provides:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims.
Only attorney fees are recoverable if an employer or an insurer arbitrarily discontinues payment of workers' compensation benefits due. Williams v. Rush Masonry, Inc. 98-2271 (La.6/29/99); 737 So.2d 41. "Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." Brown, 98-1063, p. 8-9; 721 So.2d 885, 890. Whether termination of workers' compensation benefits is arbitrary, capricious, or without probable cause depends primarily on facts known to the employer or insurer at time of its action. Creel v. Concordia Elec. Coop., Inc. 95-914 (La.App. 3 Cir. 1/31/96); 670 So.2d 406, writ denied, 96-0577 (La.4/19/96); 671 So.2d 923.
Thus, we must consider the facts known to the Appellees at the time they terminated Appellant's weekly indemnity benefits. The Appellees argue they were justified in terminating Appellant's benefits because he lied during his deposition. In support of their argument, Appellees cite portions of the Appellant's deposition, taken on May 21, 1999. The Appellant made the following statements during questioning by the Appellees:
Q: Are you working right now?
A: No, sir.
Q: Where's the last place you worked?
A: Bechtel, Mexico.
. . . .
Q: Did you work at all after you got back?
A: No, sir.
. . . .
Q: Have you applied for employment anywhere since the time of the accident?
A: No, sir.

*46 Q: Why not?
A: I don't feel like I can hold my job as far as heavy equipment or tile, the trades that I know.
Q: You haven't looked for any other kind of employment, right?
A: No sir.
. . . .
Q: And the conditions keep you from being able to operate heavy equipment as far as you are concerned, right?
A: Yes, sir.
Q: And that's why you haven't tried to operate any heavy equipment or get a job, right?
A: Yes, sir.
Q: What do you do all day?
A: Pretty much TV and justI visit my son at school.
. . . .
Q: The pains have been bad enough to keep you from operating any equipment since the time of your accident?
A: Yes, sir.
. . . .
Q: You understand you are under oath here today just like you are going to be in court?
A: Yes, sir.
Q: And this is in connection with your comp claim, correct?
A: Yes, sir.
. . . .
Q: And this agony in your neck is one of the things that keeps you from being able to operate any equipment, right?
A: Yes.
. . . .
Q: What sources of income do you have at this time?
A: Just workmen's comp.
The Appellant made the following statements under direct examination by his attorney:
Q: Since the accident where you fell in the ditch, or let me put it this way, since you returned to the United States from Mexico, have you even sat on a piece of equipment?
Mr. Smith:
Object to the form of the question, but you can answer it.
A: No, sir.
Q: Have you done any odd jobs, anything of that nature?
A: No, sir.
Q: Nothing where you were paid some small amount of money?
. . . .
Q: You haven't earned any money since you returned to the United States?
A: No, sir.
Based on these statements during the deposition, the Appellees assert that they were justified in terminating the Appellant's benefits because he committed fraud in making these statements. The Appellees base their argument on inconsistencies between the Appellant's deposition testimony and his actions taken during their surveillance. The surveillance videotapes taken on January 6-8, 1999, and May 20-21, 1999, show the Appellant operating a tractor and a bobcat, lifting plywood boards, and leveling a building.
Upon a review of the record, we do not find that the Appellant's statements, made during his deposition, constitute fraud. Shortly after receiving the transcript of his deposition, on July 1, 1999, the Appellant filed an errata sheet clarifying several of his answers given during his deposition. In this errata sheet, the Appellant admitted that he had operated a small farm *47 tractor and a bobcat, and he indicated that he had cut grass at his mother's trailer park every other weekend since March 1999. The Appellant further admitted using a tractor to move a temporary building about forty feet at his mother's house. Finally, the Appellant admitted that he helped a friend level a mobile home pad using the bobcat and the tractor. The Appellant indicated his friend paid him $165 and that he paid Kenneth Allen $75 to help with the labor. At trial, his testimony was consistent with the corrections he made on his errata sheet.
While we disagree that the Appellant's deposition statements amount to fraud, we find the Appellees' action in terminating the Appellant's benefits was not arbitrary and capricious. The Appellees' termination of the Appellant's benefits based on the inconsistencies in his deposition testimony and their surveillance videotapes did not constitute "willful and unreasoning action" such that an award of attorney fees under La.R.S. 1201.2 is merited. See Brown, 98-1063, p. 8; 721 So.2d 885, 890. Therefore, we find that the WCJ did not err in failing to award the Appellant penalties and attorney fees for the Appellees' termination of his workers' compensation benefits.

DECREE
Considering the foregoing discussion, we hold that the WCJ erred in finding that the Appellant did not meet his burden of proving that his injuries were work-related. Accordingly, we order the Appellees to reinstate the Appellant's benefits retroactive to the date of their termination, and we order the Appellees to authorize the Appellant's needed surgery. In addition, we hold that the WCJ did not err in failing to award penalties and attorney fees for the Appellees' refusal to provide medical benefits. Finally, we hold that the WCJ did not err in failing to award penalties and attorney fees for the Appellees' termination of Appellant's weekly indemnity benefits. All costs are assessed against the Appellee.
REVERSED IN PART; AFFIRMED IN PART.